856 P.2d 872

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Rodney ARAIZA, Defendant–Appellant.**

No. 18398.

Supreme Court of Idaho,
Boise December 1992 Term.

July 8, 1993.

Allen Trimming, Ada County Public Defender, and August H. Cahill, Deputy Public Defender, Boise, for defendant-appellant. August H. Cahill argued.

Larry EchoHawk, Atty. Gen., and Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent. Lynn E. Thomas argued.

JOHNSON, Justice.

This is a criminal case in which Rodney Araiza was convicted of first-degree murder and riot.

We hold:

1. The trial court's denial of Araiza's motion to strike the jury panel based on a claim that the state used its peremptory challenges to exclude racial minorities from the jury panel was not clearly erroneous.

2. The trial court's denial of motions by Araiza's attorney to withdraw from the case based on a conflict of interest did not violate Araiza's constitutional right to effective assistance of counsel and was not an abuse of discretion.

3. The trial court did not abuse its discretion under I.R.E. 608(b) or violate Araiza's constitutional right of confrontation by refusing to allow cross-examination of a state's witness concerning the witness' prior alleged perjury. Under I.R.E. 608(b), the trial court correctly excluded testimony from a defense witness concerning

specific instances of untruthfulness of the state's witness.

4. The state's late disclosure or non-disclosure of evidence did not violate Araiza's constitutional right to a fair trial.

5. The trial court did not abuse its discretion in denying Araiza's motions for mistrial.

6. The trial court did not abuse its discretion in denying Araiza's motion for a new trial.

7. The trial court did not impose unreasonable sentences on Araiza nor abuse its discretion in denying Araiza's motion to reduce the sentences.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS.

Richard Holmes, an inmate in the state penitentiary who had been scheduled to be a witness for the state in Maxwell Hoffman's trial for murder, was killed during a prison riot in September 1988. During the riot several inmates took over the penitentiary's close custody unit. When the authorities regained control of the unit several hours later, they found Holmes dead in his cell. There was a large hole punched through Holmes' cell wall, and someone had stabbed Holmes a number of times with a sharp object.

Araiza was an inmate in the close custody unit. The state charged Araiza with riot and first degree murder. Although the investigation indicated that several inmates were probably connected with the murder, Araiza was the only inmate charged. About twenty inmates were charged with riot.

In Araiza's trial, the state called a number of correctional officers and inmates who testified concerning Araiza's participation in the riot and placed Araiza in Holmes's cell during the time of the murder. The state also played an audio tape recording of Holmes's murder in which Holmes pleaded with an inmate named "Shorty." The state presented evidence that Araiza was the only inmate in the close custody unit known as "Shorty." In response, Araiza called a number of inmates who testified that Araiza was not near Holmes's cell during the murder, but arrived at the cell after Holmes was dead. Araiza testified in his own behalf that he had entered Holmes's cell after the murder to see if Holmes was alright. Araiza presented evidence that other inmates also go by the nickname "Shorty." The jury found Araiza guilty of first degree murder and riot.

Araiza requested a new trial, asserting that a new trial was required by newly discovered evidence and in the interest of justice. In support of the request, three inmates, all of whom had testified in Araiza's trial, testified that three other inmates murdered Holmes. At trial, each of these inmate witnesses had testified that they knew the identity of the murderers and that Araiza was not one of the murderers. They also stated they would not reveal who the murderers were, because they did not want to earn a reputation as "snitches." In their testimony in support of the request for new trial, the three inmate witnesses identified inmates LeMere, Sjogren, and Clarke as Holmes's murderers. Another inmate, who did not testify at trial, also testified in support of the request for a new trial. This inmate stated that Sjogren admitted to him that he, Clarke, and another inmate had stabbed an inmate during the riot.

As part of the sentencing hearing, which was combined with the hearing on the post-trial motions, Araiza called Miyauchi, a student volunteer at the prison, to present mitigating evidence. Miyauchi testified that she had received information from another volunteer that inmate LeMere admitted killing Holmes and that Araiza did not commit the murder. Araiza also called as a witness the volunteer chaplin, Bull, who had spoken with LeMere. Bull testified that LeMere admitted to him that he was responsible for the murder along with inmates Clarke and Sjogren.

Araiza also asked the trial court to consider the motion for new trial in light of

five letters written to the trial court by jurors. The letters, which are not part of the record on appeal but which are referred to by the trial court in its ruling on the motion for new trial, seem to have indicated that five of the jurors either had reservations about Araiza's level of guilt or requested leniency by the trial court in sentencing Araiza.

The trial court rejected Araiza's motion for a new trial holding that the allegedly new evidence was either already presented at trial or was unreliable because of lack of credibility and lack of first-hand knowledge. The trial court also rejected Araiza's reliance on the jurors' letters, finding that the letters might warrant mitigation of Araiza's sentence, but did not undermine the basis for Araiza's conviction.

Although the state argued in favor of the death penalty in sentencing, the trial court found that mitigating circumstances existed that outweighed any statutory aggravating circumstance. The trial court sentenced Araiza to life in prison with a fixed term of thirty-five years for the first degree murder conviction and to a concurrent fixed term of twenty years for the riot conviction. Araiza moved for a reduction of sentence claiming that his youth and other circumstances of prison life warranted a lesser sentence. The trial court denied this motion.

Araiza appealed, raising numerous issues concerning his trial, the denial of his post-trial motions, and his sentences.

## II.

### THE TRIAL COURT'S FINDING THAT THE STATE'S PEREMPTORY CHALLENGES WERE NOT USED TO EXCLUDE RACIAL MINORITIES FROM THE JURY PANEL WAS NOT CLEARLY ERRONEOUS.

Araiza asserts that his constitutional rights were violated by the state's use of peremptory challenges to exclude two jurors who were members of racial minorities. Araiza contends the trial court should not have accepted the state's explanation for use of its peremptory challenges of these jurors. We conclude that the trial court's acceptance of the state's explanations was not clearly erroneous.

At the conclusion of voir dire, Araiza objected to the composition of the jury panel. Citing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Araiza claimed the state improperly used its peremptory challenges to exclude two members of racial minorities from the jury. Specifically, Araiza challenged the state's motives for excluding prospective juror Mose and prospective juror Martinez. Mose and Martinez were the only two potential jurors who were members of recognizable racial minorities.

The trial court found that based on appearance, Mose was black, and that based on appearance and questioning, Martinez was Hispanic. The trial court held that Araiza established a prima facie showing of racially discriminatory use of peremptory challenges and requested the state to explain on the record its reasons for peremptorily challenging Mose and Martinez. The state explained that it challenged Mose because she did not have enough "significant community contacts" to have a stake in the outcome of the trial. The state justified its challenge of Martinez by claiming she lacked sufficient "life experiences" and that this could hamper her in making necessary credibility determinations. Araiza objected to these explanations, arguing they were a pretext for impermissible racial discrimination. The trial court found that the reasons offered by the state were valid, nonracial reasons for exercising peremptory challenges and overruled Araiza's objection to the jury panel.

This is the first case to reach this Court alleging racially impermissive use of peremptory challenges. In *Batson*, the United States Supreme Court held that a prosecutor's racially motivated use of peremptory challenges to exclude potential jurors of the same race as the defendant violates the Equal Protection Clause of the United States Constitution. In *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme

Court held that a prosecutor's racially motivated use of peremptory challenges violates the excluded juror's right to equal protection of the laws and that a criminal defendant, regardless of racial background, has standing to assert the equal protection claim of an excluded juror.

■ The framework for asserting impermissible racial motivation in the use of peremptory challenges is set out in *Batson.* Once a criminal defendant makes out a prima facie case of purposeful discrimination, the state must come forward with a racially-neutral explanation for challenging the prospective juror. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. This explanation must be racially neutral and may not be based on an assumption that a juror will be partial to the defendant based on the juror's race or on any racial stereotype. *Georgia v. McCollum,* — U.S. ——, ——, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33, 51 (1992). It is then up to the trial court to determine whether the explanation offered by the state overcomes the inference of discrimination established by the defendant's prima facie showing. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. In *Powers,* the Court said: "It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well founded objections to the use of peremptory challenges as a mask for race prejudice." *Id.* 499 U.S. at 416, 111 S.Ct. at 1374, 113 L.Ed.2d at 429. In *Batson,* the Supreme Court stated that "'the prosecutor must give a clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Id.* 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20, 90 L.Ed.2d at 88–89 n. 20.

■ *Batson* and *Powers* indicate that trial courts have broad discretion in formulating the necessary framework for evaluating the explanation given by the state for use of peremptory challenges after a *Batson* objection. *Batson* indicates the trial court's findings concerning the explanation should be treated the same as findings of intentional discrimination in Title VII sex discrimination cases and that "[s]ince the

trial judge's findings in the context of consideration here will largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 1724 n. 21, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 89 n. 21. The "credibility" determination referred to in *Batson* includes the trial court's perception of the validity of the prosecutor's explanation for exercising peremptory challenges on minority jurors. Therefore, we will only overturn the trial court's finding if it is clearly erroneous in light of the facts as a whole. *U.S. v. Lewis,* 837 F.2d 415 (9th Cir.1988), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

■ Araiza contends that the record reveals the state's explanations were a pretext for racial discrimination. The transcript of the voir dire reveals, however, that the state questioned all the jurors about how long they had lived in the Boise area and whether they were comfortable judging whether other people were telling the truth. In answer to questions on voir dire, Mose stated that she had lived in Boise for about a year and that she wanted to transfer back to the state of Washington as soon as possible. When Martinez was asked whether she regularly needed to assess the truthfulness of others as part of her job or in her daily life, Martinez answered that she was unsure and that she was generally a trusting person who believed that people usually told the truth. Martinez also indicated that she was "nervous" about being a juror. The trial judge had an opportunity to observe the prosecutor and the potential jurors during voir dire and was in a better position than we are to determine the motivation of the state in challenging these jurors. We conclude that the trial court's acceptance of the explanations given by the state was not clearly erroneous.

■ Araiza urges us to adopt a standard which would require the trial court to compare the characteristics of the excluded jurors to the characteristics of the jurors left on the panel. We decline to impose such a requirement on our trial courts.

As we have discussed above, the defendant bears the burden of proving a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 86. Once this showing is made, the burden shifts to the state to offer a non-racial reason for exercising the peremptory challenge. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. After setting forth these initial burdens of production, the Supreme Court stated that "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88–89. This statement makes it clear that the party asserting discriminatory use of a peremptory challenge bears the ultimate burden of persuasion and must show that purposeful discrimination was, in fact, the basis for use of the peremptory challenge.

The party asserting improper use of a peremptory challenge should be given an opportunity to present additional evidence that the non-racial explanation is a pretext. This evidence aids the trial court in determining if there was purposeful discrimination. Although *Batson* does not specifically set forth a pretext analysis, such an analysis is supported by a footnote in the opinion citing *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Batson* 476 U.S. at 98, n. 20, 106 S.Ct. at 1724, n. 20, 90 L.Ed.2d at 88–89, n. 20. *Burdine*, an employment discrimination case, recognized that once an employer met its burden of production and rebutted the plaintiff's prima facie case by producing evidence of a non-discriminatory purpose for its actions, the employee then should have an opportunity to produce evidence establishing pretext. If the employee did not present evidence of pretext, the trial court would resolve the factual issue based on the evidence produced in the plaintiff's prima facie case.

Comparison evidence is evidence asserting pretext. If offered by the party claiming improper use of a peremptory challenge, such evidence should be considered by the trial court. We decline to impose a duty on our trial court's to proceed with a comparison of jurors in every case asserting discriminatory use of a peremptory challenge when such evidence is not presented to the trial court by one of the parties.

In this case, Araiza presented the trial court with comparison evidence and argued that the state's explanation was a pretext in light of this evidence. Araiza specifically asserted that another non-minority juror was not removed from the jury panel even though that juror had lived in Idaho for the same amount of time as Mose. Araiza also claimed that jurors younger than Martinez were not removed from the panel. In denying the motion for a mistrial, the trial court recognized that Araiza made a prima facie showing of racial discrimination, but found that the state had offered a racially neutral explanation for exercising peremptory challenges on Martinez or Mose. Although the trial court did not expressly refer to the comparison evidence offered by Araiza, the trial court did not refuse to consider the evidence. We assume that the trial court did consider this evidence in making its ruling. To eliminate the need for an appellate court to rely on the assumption that comparison evidence was considered, trial courts should in future cases make specific findings concerning the effect of the evidence on the trial court's decision. This will ensure that the trial court considered comparison evidence offered to establish pretext.

### III.

**THE TRIAL COURT'S DENIAL OF THE MOTION BY ARAIZA'S ATTORNEY TO WITHDRAW AS COUNSEL FOR ARAIZA DID NOT VIOLATE THE UNITED STATES CONSTITUTION AND WAS NOT AN ABUSE OF DISCRETION.**

Araiza asserts the trial court improperly denied his attorney's motions to withdraw as counsel. Araiza contends continued representation by his attorney presented a conflict of interest that prejudiced his defense and violated his constitutional right

to effective assistance of counsel. We disagree.

Araiza's attorney made two motions to withdraw as counsel for Araiza. The first motion was made on the ninth day of trial during the testimony of Wayne Cunningham, a witness for the state. Araiza's attorney argued that his withdrawal was necessary because prior representation of Cunningham by the public defender's office created a conflict of interest. Araiza's attorney was a public defender, and at the time of trial, the public defender's office represented Cunningham in an appeal based on the prior representation. Araiza's attorney claimed he had received information from this prior representation and that it was necessary to use this information as part of Araiza's defense.

In an in camera discussion, Araiza's attorney stated that Cunningham admitted to an investigator from the public defender's office that he had lied under oath at his own trial. Araiza's attorney claimed that this situation created a conflict of interest because zealous representation of Araiza required using this confidential communication to impeach Cunningham's testimony at trial and that this conflicted with Cunningham's interests as a client of the public defender's office.

The trial court denied the motion, characterizing the issue as one of privilege rather than conflict of interest. The trial court ruled that any potential conflict was sufficiently resolved by appointing separate counsel to represent Cunningham in both the appeal and in the exercise of any privilege he might have in Araiza's case. The trial court noted that the communication that Araiza's attorney wished to use in cross-examining Cunningham was relevant only to impeachment and did not prevent Araiza from presenting any probative evidence at trial.

On the twelfth day of trial, Araiza's attorney made a second motion to withdraw claiming that his ongoing representation of Clarke, an inmate scheduled as a potential witness for the state, created a conflict of interest. At the time of trial, Clarke was awaiting sentencing on a conviction for riot stemming from the same prison riot that is involved in this case. Araiza's attorney argued that the state had interviewed Clarke as a potential witness in the Araiza trial and that he could not adequately advise Clarke while representing Araiza's best interests. The trial court denied the motion to withdraw and restricted the state from further contact with Clarke unless Clarke was represented by independent counsel. The state did not call Clarke as a witness at trial.

Araiza claims *Halloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) and *Roles v. State,* 100 Idaho 717, 604 P.2d 731 (1979) support his assertion that the trial court's denial of his attorney's motion to withdraw violated Araiza's constitutional right to effective assistance of counsel. We conclude these cases do not support Araiza's claims.

In *Halloway,* the Supreme Court addressed the issue of joint representation of defendants and reaffirmed the Court's ruling in *Glasser v. United States* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) that requiring an attorney to represent two co-defendants with conflicting interests violated those defendants' Sixth Amendment right to effective assistance of counsel. *Id.* 435 U.S. at 482, 98 S.Ct. at 1178, 55 L.Ed.2d at 433. In *Halloway,* the Supreme Court also held that if defense counsel timely raises the issue of a conflict of interest in joint representation, the trial court commits reversible error if it does not take adequate steps to ascertain the likelihood of an actual conflict arising at trial. *Id.* at 484, 98 S.Ct. at 1178–79, 55 L.Ed.2d at 434. If the trial court denies the motion without taking steps to ascertain the likelihood of conflict at trial, the defendant need not prove prejudice from the joint representation at trial. *Id.* at 489, 98 S.Ct. at 1181, 55 L.Ed.2d at 437.

In *Roles,* this Court ruled that a defendant's claim that a guilty plea should be set aside based on the potential for a conflict of interest arising from joint representation was without merit, because there was no indication in the record that the plea was

entered in order to avoid a potential conflict of interest. This Court stated "absent a showing that there was at least a possible conflict of interest between the co-defendants at the time of the joint representation ... there is no basis for defendant's claim that his Sixth Amendment rights were violated." *Id.* 100 Idaho at 719, 604 P.2d at 733.

A narrow reading of *Roles* and *Halloway* would limit them solely to cases of joint representation. The context in which Araiza's attorney raised the question of conflict of interest, however, raises the same issues as those addressed in *Roles* and *Halloway.* Therefore, we apply the principles developed there to this case.

 Araiza has not shown that an actual conflict of interest impaired his attorney's ability to defend him at trial. As to the first motion to withdraw, the trial court correctly characterized the situation as one of privilege rather than conflict of interest. The trial court later ruled that Cunningham did not have a privilege for confidential communications concerning the information at issue because the communication had been disclosed in Cunningham's post-conviction proceeding. This ruling is not challenged by Araiza. Therefore, there was no basis for a claim of privileged communications that would raise an issue of conflict of interest. As to the second motion to withdraw, no actual conflict of interest could have affected Araiza's defense because Clarke was never called as a witness.

Araiza contends that the trial court's refusal to allow cross-examination of Cunningham concerning Cunningham's alleged prior perjury demonstrates that the claimed conflict of interest affected the ability of Araiza's attorney to represent him completely at trial. We reject this claim because the trial court's decision to exclude this evidence was based on an interpretation of the rules of evidence and not on the trial court's ruling concerning the motion to withdraw. The trial court was correct when it ruled that Araiza was not being denied presentation of any probative evidence in his case based on a conflict of interest.

We conclude that no actual conflict of interest arose at trial that affected Araiza's attorney's ability to present a full defense.

Applying the three-step analysis of *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989), we also conclude that the trial court in this case did not abuse its discretion in denying the motions to withdraw.

## IV.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION UNDER I.R.E. 608(B) OR VIOLATE ARAIZA'S CONSTITUTIONAL RIGHT TO CONFRONT WITNESSES.

Araiza asserts that the trial court abused its discretion under I.R.E. 608(b) and violated Araiza's constitutional right to confront witnesses by preventing Araiza from asking Cunningham if he perjured himself at a prior trial and from asking an investigator for the public defender's office, Elam, about specific instances of Cunningham's untruthfulness. We disagree.

I.R.E. 608(b) provides:

Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting [the witness'] credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning (1) [the witness'] character for truthfulness or untruthfulness, or (2) the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

I.R.E. 608(b) prohibits the use of extrinsic evidence to prove that Cunningham lied at his own trial, subject to cross-examination of Cunningham on this question in the discretion of the trial court. This allows the trial court to weigh the effect of allowing this inquiry with the recognition that impeachment evidence is collateral evidence

and may be overly time-consuming and confusing to the jury.

In determining whether the trial court abused its discretion in denying Araiza cross-examination of Cunningham about his perjury in his own trial, we apply the three-part analysis in *State v. Hedger*, 115 Idaho at 600, 768 P.2d at 1333. We conclude the trial court did not abuse its discretion. The trial court recognized it had discretion, acted within the limits of its discretion, and reached its decision through an exercise of reason.

Araiza contends that even if the trial court's ruling was proper under I.R.E. 608(b), the limitation on his opportunity to impeach Cunningham violated his Sixth Amendment right to confront witnesses. Although Araiza did not present this issue to the trial court, we address the issue. If the limitation on Araiza's opportunity to impeach Cunningham through cross-examination were error, it would be fundamental error, because it goes to the foundation or basis of Araiza's rights. *State v. Kenner*, 121 Idaho 594, 597, 826 P.2d 1306, 1309 (1992).

■ The Sixth Amendment guarantees that in all criminal proceedings the accused shall have the right to be confronted with the witnesses against the accused. The United States Supreme Court has recognized the importance of effective cross-examination in securing this right. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis*, the Supreme Court held that the Sixth Amendment allows a defendant to inquire on cross-examination into potential bias or motive of a witness. *Davis* held that in order to give meaning to the right to confront witnesses, the defendant must be permitted to do more than merely ask whether a witness is biased, but must be allowed to show why the witness might be biased by presenting the facts necessary to allow the jurors to form inferences regarding the witness' impartiality. *Id.* at 319, 94 S.Ct. at 1111, 39 L.Ed.2d at 355.

■ A defendant's right to confront witnesses, however, is not absolute. The trial court may reasonably limit cross-examination that is harassing, confusing, repetitive, or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986). Concerning limitations on cross-examination, the Supreme Court has stated that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (*citing Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)).

■ Araiza urges us to apply the broad right to cross-examine witnesses through questions establishing motive or bias recognized in *Davis* to cases involving a witness' general propensity for truthfulness. We conclude that the trial court's limitation on the scope of cross-examination in this case went to a collateral issue and did not interfere with Araiza's right to conduct a full cross-examination of Cunningham as to all material issues of the case.

In *Davis*, the Supreme Court recognized that the bias, prejudice, or motive of a witness to lie concerning issues presented in a trial is always material and relevant to effective cross-examination. *Id.* 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 354. The Supreme Court stated:

> A ... particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may *relate directly to issues or personalities in the case at hand.* The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."

*Davis* at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 354 (emphasis added).

Araiza alleges that he should have been able to ask Cunningham on cross-examination whether he had lied under oath on a prior occasion. If Cunningham had been convicted of perjury for his testimony on this prior occasion, cross-examination as to

the conviction would have been admissible under I.R.E. 609. Without a conviction, however, evidence of Cunningham having been untruthful on a prior occasion would only be evidence that he might also be untruthful on this occasion. Araiza has not asserted that his questioning was an attempt to elicit that Cunningham had a particular reason to give false testimony in this case. The impeachment evidence Araiza wished to offer was collateral to Cunningham's testimony at trial. We conclude that the trial court's limitation on collateral testimony did not violate Araiza's rights under the Confrontation Clause. The trial court's ruling did not impinge on Araiza's right to cross-examine Cunningham on all directly material evidence. Araiza was able fully to cross-examine Cunningham concerning the accuracy of his testimony and concerning all of his statements that directly related to the charges against Araiza and to Araiza's defense.

On the twelfth day of trial, Araiza called the investigator for the public defender's office, Elam, to impeach Cunningham's testimony. Araiza wanted to have Elam testify concerning Cunningham's admission that he committed perjury in his own trial. The trial court held that I.R.E. 608(b) limited impeachment testimony by a third party to opinion evidence. The trial court limited Elam's testimony to his opinion concerning Cunningham's character for truthfulness and prohibited Araiza from inquiring into any specific conduct which formed the basis of that opinion.

The express language of I.R.E. 608(b) prohibits proof through extrinsic evidence of specific instances of conduct by a witness for the purposes of impeachment. Araiza claims the trial court impermissibly limited the foundation Araiza could lay to support Elam's opinion. If the trial court had allowed Araiza to ask Elam to testify as to the specific instances of the witness' conduct supporting the opinion, the trial court would have allowed proof of conduct through extrinsic evidence. This is expressly prohibited by I.R.E. 608(b).

## V.

## THE STATE'S LATE DISCLOSURE AND NON-DISCLOSURE OF EVIDENCE DID NOT VIOLATE ARAIZA'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

Araiza asserts that the non-disclosure or late disclosure of evidence violated Araiza's constitutional right to a fair trial. We disagree.

During trial, Araiza made a number of objections claiming that the state failed to disclose, or belatedly disclosed, evidence required to be disclosed under I.C.R. 16. On the eighth day of trial, Araiza moved for a mistrial claiming the state failed to disclose a taped interview of correctional officer Miller, a witness for the state. Araiza made this objection the day after Miller testified. The trial court took Araiza's motion for mistrial under advisement, ordered the state to provide the tape, and indicated that Miller would be available for further cross-examination by Araiza.

On the eighth day of trial, the state informed the court it had copies of handwritten notes taken from an interview of Cunningham. These documents had not been disclosed to Araiza. Cunningham first told state and defense investigators that he did not have any information regarding events occurring during the riot. Later, after the state transferred Cunningham to a Nevada prison, Cunningham made a statement to the state regarding Araiza's involvement in the riot and murder. The notes related to this statement. The trial court held these notes were discoverable and ordered the state to provide copies immediately to Araiza.

On the ninth day of trial, Araiza objected to the state's failure to disclose information regarding prior conversations Cunningham had with Araiza. Araiza claimed that these conversations were discoverable. The trial court held that these conversations were not discoverable under I.C.R. 16(b)(1) and did not order disclosure of this information.

On the eleventh day of trial, the state called an expert witness to testify regarding the placement of bloody fingerprints on

a cabinet from Holmes's cell. The expert witness testified that the prints belonged to Araiza and that the placement of the prints on the side of the cabinet indicated Araiza was positioned in such a way in the cell as to indicate he participated in the murder. Araiza objected to the testimony regarding the placement of the fingerprints claiming the location of the fingerprints was not disclosed. The trial court reviewed the report submitted to Araiza in discovery, as well as the transcript from the preliminary hearing, and allowed the testimony.

██ The standard for testing the effect of the non-disclosure of evidence is set forth in *State v. Higgins*, 122 Idaho 590, 836 P.2d 536 (1992). In *Higgins*, this Court adopted the United States Supreme Court's materiality test set forth in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which provides that non-disclosure of evidence does not require reversal unless there is evidence that the result of the trial would have been different if the evidence had been disclosed. The only evidence not disclosed before or during the trial was the communications between Araiza and Cunningham that were not written or recorded. I.C.R. 16(b)(1) requires the prosecution to permit inspection and copying of only written or recorded statements of the defendant. The conversations did not include exculpatory statements and Cunningham was not an agent of the state when the statements were made. Therefore, there was no requirement of automatic disclosure under I.C.R. 16(a).

██ This Court has held that late disclosure of evidence requires a reversal of conviction if the lateness of the disclosure impaired the defendant's constitutional right to receive a fair trial by affecting the defendant's ability to prepare and present his defense. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991). The notes relating to Cunningham's statement in the Nevada prison were an important piece of information. They indicate the state knew approximately a month before the trial that Cunningham planned to change his testimony. There is no evidence that Araiza knew Cunningham was going to testify unfavor-

ably against him before the notes were disclosed during trial. Araiza has not indicated, however, how late disclosure of this information affected his trial preparation. Also, once Araiza had the notes, he did not move for a continuance for further investigation in light of the notes.

██ Concerning other items Araiza alleges were either not disclosed or disclosed late, the trial court did not specifically rule on Araiza's motion for a mistrial regarding late disclosure of the taped interview with officer Miller. Araiza presented a motion. The trial court then ordered the state to produce the tape, made Miller available for further cross-examination, and took the motion under advisement. The issue was never again addressed by the trial court, nor did Araiza request a ruling. All we can say for sure is that the motion was not granted.

Araiza has failed to indicate any prejudice concerning late disclosure of the taped interview with officer Miller. Regardless of the trial court's reasons for not granting the mistrial, Araiza must establish that he suffered some sort of prejudice from the trial court's actions. Araiza does not argue that his trial preparation was affected, did not move for a mistrial after the tapes were disclosed and, because Miller was never recalled for cross-examination, the record does not indicate any resulting prejudice.

Concerning the report on the fingerprints, the trial court's ruling implicitly found that any report that existed had already been disclosed to Araiza. Araiza does not claim that the report the trial court referred to at trial was not disclosed or that there was any additional report that was not disclosed. Therefore, the alleged non-disclosure is not properly an issue on appeal.

## VI.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING ARAIZA'S MOTIONS FOR A MISTRIAL.

Araiza asserts that the trial court abused its discretion in denying his motions for a mistrial. We disagree.

In addition to the motions for mistrial discussed above, the defense moved for a mistrial based on alleged statements regarding prior bad acts by Araiza. On the eighth day of trial, Araiza moved for a mistrial after a witness for the state, correctional officer Brasseth, testified that Araiza was sniffing glue on the day of the murder and had a reputation for sniffing glue. The trial court upheld Araiza's objection to the statement but denied the motion for a mistrial choosing instead to instruct the jury to disregard the statement made by the witness.

After Araiza testified in his own behalf, the trial court allowed the state to cross-examine Araiza concerning whether he was intoxicated during the riot and whether Araiza had threatened another inmate witness prior to trial. The trial court correctly ruled that this testimony was admissible even though it concerned unrelated bad acts. The trial court found Araiza had opened the door to this area of cross-examination in direct examination. Araiza did not move for a mistrial based on the admission of this testimony.

Araiza did request a mistrial on the basis of evidence regarding the existence of an "inmate code." On the thirteenth day of trial, Araiza moved for a mistrial in response to evidence offered by a state witness regarding an "inmate code." Araiza claimed this evidence was improper impeachment evidence because it attempted to establish that inmates will lie out of fear of reprisal from other inmates. The trial court overruled the objection and denied the motion for a mistrial, ruling that the. evidence of an "inmate code" was relevant as to possible bias of the witness and to a possible motive for killing Holmes. The trial court refused to allow the state to use the term "inmate code," but allowed the state to ask specific questions regarding an inmate's perception of life in prison. Araiza again objected to testimony of the "inmate code" when the state presented rebuttal. The trial court ruled that this testimony was repetitive and prohibited the state from calling an intended expert witness to testify regarding the existence of an "inmate code."

Araiza also contends that the totality of errors by the trial court required the trial court to grant a mistrial.

I.C.R. 29.1(a) provides:

A mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives [the defendant] of a fair trial.

Whether a trial court should grant a mistrial is a matter of discretion. In the absence of an abuse of discretion, we will not overturn the trial court's denial of a mistrial. *State v. Rhoades*, 120 Idaho 795, 799, 820 P.2d 665, 669 (1991), *cert. denied*, — U.S. —, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992). In this case, the trial court demonstrated it understood the ruling on the motions for mistrial were a matter of discretion, acted within the limits of this discretion in denying the motions, and reached its decision through an exercise of reason. Therefore, applying the three-step analysis of *State v. Hedger*, 115 Idaho at 600, 768 P.2d at 1333, we conclude the trial court did not abuse its discretion.

## VII.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING ARAIZA'S MOTION FOR A NEW TRIAL.

Araiza asserts that the trial court abused its discretion in denying his motion for a new trial. We disagree.

Citing *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976), the trial court held that the "new evidence" did not warrant a new trial because the evidence, if presented to the jury, was insufficient to sway the jury to acquit Araiza. Specifically, the trial court found the testimony from the inmates was not credible and the testimony from the non-inmates was not reliable because the witnesses lacked first-hand knowledge. The trial court rejected the

claim that the interests of justice warranted granting Araiza a new trial. The trial court held that the fact that other inmates had not been charged in the murder was irrelevant and that the letters from the jurors, although sincere, did not indicate an injustice in Araiza's conviction. Applying *Hedger*, we conclude that the trial court did not abuse its discretion.

## VIII.

## THE TRIAL COURT DID NOT IMPOSE UNREASONABLE SENTENCES ON ARAIZA AND DID NOT ABUSE ITS DISCRETION IN DENYING ARAIZA'S MOTION TO REDUCE THE SENTENCE.

Araiza asserts that the sentences imposed by the trial court were unreasonable and that the trial court abused its discretion by denying Araiza's motion for reduction of the sentences. We disagree.

The state argued in favor of the death penalty at the sentencing hearing. Araiza called a number of inmates and other witnesses to testify regarding Araiza's character and in mitigation. In its sentencing order, the trial court found the following statutory aggravating circumstances existed: (1) Araiza has a propensity towards violence, (2) Holmes was scheduled to be witness in another trial, and (3) the crime occurred in a penal institution. The trial court found the following mitigating circumstances existed: (1) Araiza has potential for rehabilitation, (2) Araiza has led a disadvantaged life, and (3) jurors requested leniency. The trial court found the mitigating circumstances outweighed each of the statutory aggravating circumstances and sentenced Araiza to life in prison with a fixed term of thirty-five years for murder and a fixed term of twenty years for riot to be served concurrently with the murder sentence.

Araiza moved under I.C.R. 35 for reconsideration and reduction of the fixed portion of his sentence. The trial court denied the motion, finding that the arguments raised on behalf of a reduction in sentence were essentially the same as those presented to the trial court at the initial sentencing proceeding. In addition, the trial court noted that the sentence in this case served as a deterrent to others against committing crimes while incarcerated.

■ The standard of review for determining whether the trial court's sentence was an abuse of discretion is set forth in *State v. Broadhead*, 120 Idaho 141, 814 P.2d 401 (1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992). Under *Broadhead*, a sentence is an abuse of discretion if it is unreasonable in light of the goals of sentencing. In reviewing a sentencing judge's view of the relevant facts, the Court will not substitute its own view of the facts where reasonable minds might differ. *Id.* at 145, 814 P.2d at 405.

■ In sentencing Araiza, the trial court found that Araiza was a threat to the community. This indicates the trial court was concerned in sentencing Araiza with the protection of society—the primary goal in sentencing. Although reasonable minds might differ whether the sentences imposed were necessary for the protection of society, we cannot say that the sentences are excessive under any reasonable view of the facts. Therefore, we conclude the sentences were not unreasonable.

## IX.

## CONCLUSION.

We affirm Araiza's conviction and sentence.

McDEVITT, C.J., TROUT, J., concur, and REINHARDT, J., Pro Tem, concurs, except as to part II, in which he concurs in the result.

BISTLINE, Justice, dissenting.

Araiza argued at trial that the prosecution peremptorily disqualified two potential jurors because of their race. The prosecution responded by advancing purportedly race neutral reasons in justification of those peremptory challenges: 1) that the African–American woman did not have suf-

ficient community contacts, and 2) that the Hispanic woman did not have sufficient life experiences to make her a suitable juror. Araiza, in turn, argued that the prosecutor had allowed to remain on the jury Caucasions who lacked community contacts or had the same lack of life experiences as the minorities excluded by the prosecution. Without pausing to address the defense comparability argument, the court summarily denied the defense motion to strike the panel, observing in passing that the reasons given by the prosecutor were, in fact, racially neutral and that the court had never heard of the Ada County Prosecutor being accused of or having sought to systematically exclude minorities from jury panels. Based on that reasoning, the court concluded that Araiza had not sufficiently established that the prosecution's challenges were racially motivated.

The majority opinion as written is founded on the bare assumption, as per the recitals in the preceding paragraph, that the district court gave proper consideration to the comparison argument made by the defense. That is an assumption which I am not able to make because of the fact that there is not one iota of evidence in the record to justify it.

Not only does the trial court fail to address Araiza's argument, its conclusion is logically deficient. The fact that the trial court had never heard of the prosecutor's office being accused of racial discrimination carries very little weight, if any, and is of no import. For certain it does not establish that the prosecutor was not discriminating in the case at bar. Further, the fact the prosecutor gave race neutral reasons for the peremptory challenges does not mean those reasons are sufficiently valid. Anyone with a facile mind can concoct an apparent racially neutral reason in order to mask purposeful discrimination. In fact, Araiza argued that the comparison evidence proved the prosecutor's reasons were a pretext. In short, the trial court's stated conclusion does not follow its stated premises.

Criminal trials such as this require of the trial court that its determination of a challenge be made on the record in open court. In that manner the court hears the race neutral explanations advanced by the prosecution as grounds for excluding the jurors and determines their verity as an acceptable basis for what otherwise will have all of the appearances of being a discriminatory peremptory challenge. Such determination necessarily involves comparing the characteristics of the challenged jurors with the characteristics of those who were not challenged. As the Eighth Circuit Court of Appeals has evaluated such a circumstance:

> What constitutes a neutral explanation is a question of comparability. Essentially, one must compare the characteristics of the individual which prompted the Government's strike with the characteristics of those not struck by the Government. In order to have a neutral explanation, the characteristics of the struck individual cannot be present in those white panel members not struck by the government. For example, if the Government strikes one prospective black juror because of the cut of his or her clothing, this peremptory challenge will be suspect if the Government allows white panel members with a similar cut of cloth to remain on the panel.

*United States v. Wilson,* 853 F.2d 606, 610 (8th Cir.1988), *aff'd en banc* 884 F.2d 1121 (8th Cir.1989); *see United States v. Thompson,* 827 F.2d 1254, 1260 (9th Cir. 1987) (defense counsel's presence at *Batson*[1] hearing is required because counsel may be "able to point out that the [prosecutor's] stated reasons were pretextual because others similarly situated were allowed to serve."). Because the trial court here gives no indication of having engaged in an analysis of the attendant circumstances, i.e., particularly Araiza's comparison argument, the judgment entered below should be vacated and remanded for reconsideration.

Notwithstanding the necessity for the foregoing dissent, this is clearly the oppor-

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

tune time to endorse the caution expressed in the majority opinion which advises,

> To eliminate the need for an appellate court to rely on the assumption that comparison evidence was considered, trial courts should *in future cases* make specific findings concerning the effect of the evidence on the trial court's decision. This will ensure that the trial court considered comparison evidence offered to establish pretext.

Op. at 88, 856 P.2d at 878 (emphasis added).