**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Docket No. 39284 |
|     Plaintiff-Respondent, | ) | |
| v. | ) | |
| DANIEL WALTER BERGERUD, | ) | |
|     Defendant-Appellant. | ) | |
| | ) | |
| STATE OF IDAHO, | ) | Docket No. 39286 |
|     Plaintiff-Respondent, | ) | |
| v. | ) | 2013 Opinion No. 54 |
| KATHLEEN GAY BERGERUD, | ) | Filed: October 22, 2013 |
|     Defendant-Appellant. | ) | Stephen W. Kenyon, Clerk |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. John P. Luster, District Judge.

Judgments of conviction and sentences, affirmed.

Sara B. Thomas, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Attorney General; Russell J. Spencer, Deputy Attorney General, Boise, for respondent. Russell J. Spencer argued.

---

LANSING, Judge

In this consolidated appeal, Daniel and Kathleen Bergerud (the Bergeruds) appeal from their judgments of conviction entered following a jury verdict finding both guilty of several drug offenses. The Bergeruds challenge the district court's ruling prohibiting them from asking the State's rebuttal witness if he had ever made a false statement to police. We conclude that exclusion of this evidence was harmless error.

1

# I.

## BACKGROUND

Evidence presented at the Bergeruds' trial indicated the following. The Bergeruds lived with their daughter and, at times, a renter and acquaintance, Robert Jones. Law enforcement officers suspected the Bergeruds of possessing and producing marijuana and searched their garbage. In the garbage, the officer found modified soda cans that appeared to have been used to smoke marijuana, a plastic tube and foil associated with methamphetamine use, match boxes with the striker plates removed, and various pieces of mail linking the Bergeruds, their daughter, and Jones to the home. The officer also obtained records of pseudoephedrine purchases which are required by law to be reported by the vendor. Using this information, the officer sought and obtained a search warrant permitting a search for marijuana and methamphetamine in the Bergeruds' home.

Multiple officers arrived at the Bergeruds' home on July 22, 2010, to execute the warrant. They announced their presence loudly and, seeing and hearing no response, broke into the home. Daniel Bergerud, his daughter, and a friend were in the home at the time officers entered it. The officers reported that immediately upon entering they smelled a strong chemical odor that they associated with the production of methamphetamine. For this reason, officers sought and obtained a second search warrant permitting them to seek and collect evidence of methamphetamine production.

In searching a closet in the downstairs bathroom of the Bergeruds' home,[1] the officers found a bi-layer liquid that later was determined to contain methamphetamine. In and around the Bergeruds' home the officers also found numerous ingredients that may be used in the manufacture of methamphetamine.

The Bergeruds were charged with trafficking in methamphetamine by manufacturing, Idaho Code §§ 37-2732B(a)(3), 18-204; manufacture of a controlled substance where a child is present, I.C. §§ 37-2737A, 18-204; possession of a controlled substance with the intent to manufacture methamphetamine, I.C. § 37-2732(a)(1)(A); conspiracy to traffic in methamphetamine, I.C. §§ 37-2732B(a)(3), 18-1701; possession of drug paraphernalia, I.C. § 37-

---

[1]     The kitchen, living room, and bedrooms where the Bergeruds slept were on the upper level of the home. Downstairs there were an additional bedroom, a bathroom, and a laundry room.

2734A; possession of marijuana, I.C. § 37-2732(c)(3); and possession of psilocybin, I.C. § 37-2732(c)(3).

At trial, the witnesses agreed that there were a number of methods for producing methamphetamine. The method officers suspected the Bergeruds of using is the ephedrine reduction-red phosphorous method. It requires several chemical reagents: ephedrine, red phosphorous, and iodine. Using these reagents, methamphetamine is produced as a bi-layer liquid. Later in the process, other reagents are used to precipitate methamphetamine powder out of the bi-layer liquid. This second process can also be done in several ways; the Bergeruds were suspected of using a gassing chamber containing salt and muriatic acid. Lastly, several other chemicals can be used at various stages and for various purposes. For example, isopropyl alcohol, commonly known as rubbing alcohol, can be used both to process pseudoephedrine pills into ephedrine and to more easily collect the red phosphorous from the striker plates of matchboxes.

When manufacturing methamphetamine, ephedrine is usually derived by processing pseudoephedrine pills. Officers did not find ephedrine or pseudoephedrine pills at the home, but did obtain records indicating that the Bergeruds had purchased over 2,500 pseudoephedrine pills between January 2009 and July 2010. They also found in excess of one hundred matchbooks with the striker plates removed in the downstairs fireplace and in the trash.

Bottles with labels indicating that each contained iodine were found in a drawer near the Bergeruds' bed and also in a downstairs bathroom closet adjacent to the bi-layer solution containing methamphetamine. Three of the bottles, found in the bedroom, held only one ounce and were still sealed. The other bottle was povidone iodine, which is usually used to treat lacerations, and the evidence was not clear whether it could have been used to produce methamphetamine. Iodine leaves characteristic staining. That staining was found on a makeshift workbench and a glass bottle, both of which were in a shed outside the home. An electric hotplate was near both the bench and the bottle. Officers confirmed their suspicion that the staining was from iodine by removing a portion of the workbench and submitting it for laboratory testing. Isopropyl alcohol was also found on a shelf in the Bergeruds' bedroom.

Muriatic acid was found in a jug outside of the home, under a deck, and obscured by a lattice. Adjacent to the muriatic acid, there was a plastic container with a "white sludge" at the bottom. One witness indicated that the bottle was probably a gassing chamber containing a

3

mixture of salt and muriatic acid which, when mixed, become a white sludge. The officer made this identification by sight and did not have any laboratory testing performed.

In addition to the items listed above, the officers found contraband unrelated to the production of methamphetamine. In the Bergeruds' bedroom, officers found a small plastic bag containing a small amount of marijuana and psilocybin mushrooms. They also found a marijuana pipe and a pipe containing what an officer believed was methamphetamine residue. The officer did not send these items out for laboratory testing, but identified the residue by sight. Officers also found a variety of other cold or allergy medications which could not be used to produce methamphetamine.

The Bergeruds admitted that they possessed certain drugs and paraphernalia, but testified that they had no knowledge of any methamphetamine production at their home. They said that they had not been aware that some of the items found at their home were there, and that other of the items had been used by them for legal purposes.

The defense position was that the State had not proved that it was the Bergeruds, rather than their occasional guest/renter, Jones, who engaged in the manufacturing of methamphetamine. According to the Bergeruds, when Jones stayed at their house he occupied a downstairs bedroom. The Bergeruds testified that they had no knowledge of the suspected gassing chamber, the bi-layer liquid, or the matchboxes with the striker plates removed. The latter two items were found downstairs, and the Bergeruds testified that they had not been downstairs frequently in the prior months because Jones was staying there. Daniel testified that he did not set up the makeshift workbench upon which the iodine staining was found. He also testified that he was not aware of any hot plate used in the shed. He assumed Jones set up the workbench and owned the hot plate.

The Bergeruds also testified to innocent uses of many of the chemicals. Daniel testified that he used the muriatic acid to clean rocks that he used to construct his deck. The Bergeruds testified that they and their daughter had allergies that were aggravated by their jobs, including working at their floral shop, and that they each used pseudoephedrine to deal with the allergy symptoms. As to the iodine, Kathleen testified that she used iodine to strengthen her fingernails and defendants testified they used iodine to treat injuries that their dog had sustained.

The Bergeruds admitted that they committed several of the nontrafficking offenses. Kathleen admitted using marijuana and Daniel admitted that he had used methamphetamine

4

twice. They also admitted that they possessed the psilocybin mushrooms but had forgotten about them. As to the paraphernalia, they admitted that the pipes found in their bedroom belonged to them. Daniel testified that the plastic tube and foil found in the garbage was a marijuana pipe he had confiscated from his daughter.

A defense expert testified that he did not believe that methamphetamine had been produced in the home based upon several factors including a low level of methamphetamine contamination in the home that was more consistent with methamphetamine use than methamphetamine production; the absence of etching on the drains, which often occurs when chemical by-products are disposed of; and less than expected staining from iodine or red phosphorous. The State countered that the defense expert assessed the house five to six months after it had been searched, during which time law enforcement officers had processed the site and permitted the Bergeruds to live there. The State also pointed out that the defense expert failed to observe some of the staining officers had earlier identified, indicating either that his search was not as thorough or that there had been an effort to remove the staining.

In addition to the expert, the Bergeruds called several witnesses including frequent house guests and an adjacent neighbor who denied detecting any chemical smells other than those associated with various home improvement projects. Additionally, there had been a wedding at the Bergerud home approximately a month before the search, and attendees testified there was no odor of methamphetamine production at that time.

In rebuttal, the State called Robert Jones, who denied any knowledge of the bi-layer liquid containing methamphetamine, the suspected gassing chamber, the staining on the workbench, or the matchboxes with missing striker plates. There is conflicting evidence concerning where Jones stayed in the home and the precise timeline of his stay. The witnesses all agreed that he predominantly stayed in the downstairs area of the home and slept on a pull-out couch. Jones received mail at the Bergeruds' home. The Bergeruds testified that he moved out of their home four or five days prior to the search, but that he left some items behind and that the moving process was done gradually. They also testified that they saw him only infrequently because they only rarely used the downstairs portion of their home while he lived there.

In an unrelated past case, Robert Jones had pled guilty to a misdemeanor charge of providing false information to a police officer. At trial, the Bergeruds sought to cross-examine Jones by asking whether he had ever lied to police, and if he denied having done so, the

5

Bergeruds sought permission to impeach Jones with evidence of the conviction. The State objected that such cross-examination was prohibited by Idaho Rules of Evidence 608 and 609. The district court sustained the State's objection, precluding questioning of Jones about lying to police or about the conviction. The court held that Idaho Rule of Evidence 609 barred the admission of the conviction because the crime was not a felony and also held that an episode of lying to police was not relevant for impeachment because it was not probative of Jones's credibility.

The jury found the Bergeruds guilty of all charges with the exception that Daniel Bergerud was acquitted of possession of psilocybin. On appeal, the Bergeruds' only claim of error is that the district court erred in excluding their proffered evidence that Jones had lied to police in the past.

## II.

## ANALYSIS

The Bergeruds concede on appeal that evidence of Jones's misdemeanor conviction was not admissible, but argue that they should have been allowed to elicit on cross-examination that Jones had previously lied to police. The Bergeruds contend that the district court erred because it did not recognize that such cross-examination was permitted under I.R.E. 608 and that the court erred in holding that the evidence was irrelevant. The State counters that admission of this evidence was foreclosed by I.R.E. 609.

The two implicated evidentiary rules state:

**Rule 608(b):**
> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility, of the witness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning (1) the character of the witness for truthfulness or untruthfulness, or (2) the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**Rule 609(a):**
> For the purposes of attacking the credibility of a witness, evidence of the fact that the witness has been convicted of a felony and the nature of the felony shall be admitted if elicited from the witness or established by public record, but only if the court determines in a hearing outside the presence of the jury that the fact of the prior conviction or the nature of the prior conviction, or both, are

relevant to the credibility of the witness and that the probative value of admitting this evidence outweighs its prejudicial effect to the party offering the witness.

Whether to admit evidence under Rule 608 is a matter of discretion for the trial court. *State v. Araiza*, 124 Idaho 82, 90, 856 P.2d 872, 880 (1993). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

As the Bergeruds point out, although Rule 608(b) prohibits *extrinsic evidence*[2] of a witness's past conduct to attack credibility, it expressly allows *cross-examination* of the witness concerning instances of the witness's conduct if it is probative of the witness's truthfulness. *Araiza*, 124 Idaho at 90, 856 P.2d at 880; *State v. Guinn*, 114 Idaho 30, 38, 752 P.2d 632, 640 (Ct. App. 1988). They contend that the district court did not recognize that the rule permitted this type of cross-examination and therefore abused its discretion in precluding cross-examination of Jones about having lied to police. We agree. Because Rule 608 expressly allows cross-examination of a witness concerning specific instances of conduct that are probative of truthfulness or untruthfulness, the Bergeruds' requested inquiry about the incident was not barred by this rule.

The State argues, however, that even though Rule 608(b) permits cross-examination of a witness concerning the witness's prior conduct that bears upon credibility, evidence of Jones's dishonesty with police is nonetheless inadmissible because it constituted a misdemeanor for which Jones was convicted, and under Rule 609 only felony convictions may be used for the purpose of attacking a witness's credibility. That is, the State contends, that only probative acts of dishonesty that *did not result in a conviction* are admissible under Rule 608. For this proposition, the State relies upon several federal court decisions construing the corresponding

---

[2]     "Extrinsic evidence" in this context means "[e]vidence that is calculated to impeach a witness's credibility, adduced by means other than cross-examination of the witness." It "may include evidence in documents and recordings and the testimony of other witnesses." BLACK'S LAW DICTIONARY 597 (8th ed. 2004).

federal rules. For example, the Ninth Circuit Court of Appeals recently held that "Rule 608(b) permits impeachment only by specific acts that have not resulted in a criminal conviction. Evidence relating to impeachment by way of criminal conviction is treated exclusively under Rule 609 . . . ." *United States v. Osazuwa*, 564 F.3d 1169, 1175 (9th Cir. 2009).

We conclude the federal authorities are inapposite, however, because Federal Rule of Evidence 609 differs in a significant way from I.R.E. 609. The Idaho rule permits use of a prior conviction to show a witness's untruthfulness only if the prior conviction was a felony, whereas F.R.E. 609(a) permits evidence of conviction of "any crime regardless of the punishment . . . if the court can readily determine that establishing the elements of the crime require proving--or the witness's admitting--a dishonest act or false statement." Thus, federal Rule 609, unlike the Idaho rule, permits the use of both felony and misdemeanor convictions if they are probative of the witness's honesty. Under that rule, evidence of a misdemeanor of the type in question here would be admissible by terms of Rule 609 without need to resort to Rule 608. Under the Idaho rules, by contrast, Rule 609 does not authorize extrinsic evidence of misdemeanor convictions, even if they are indicative of the individual's character for truthfulness or untruthfulness, so the question remains whether evidence of the conduct (but not the misdemeanor conviction itself) may be admitted on cross-examination under Rule 608.

This question is answered by the plain language of Rule 608(b). As noted above, it specifically authorizes inquiries into specific instances of the witness's conduct during cross-examination of that witness if the conduct is probative of truthfulness or untruthfulness. Even with evidence of the misdemeanor conviction itself barred, nothing in either Rule 608(b) or Rule 609 precludes evidence of untruthful conduct merely because the conduct resulted in a conviction.

The interpretation that is urged by the State not only is inconsistent with the words of Rule 608(b), it would also lead to an anomalous result. It would permit cross-examination of a witness about prior conduct for which the witness was charged with a misdemeanor if the charge was dismissed through plea bargaining or for other reasons unrelated to the merits, but it would prohibit such cross-examination if the person was actually convicted of the misdemeanor. We therefore hold that under Rule 608(b), the district court possessed discretion to permit cross-

8

examination of Jones about his episode of lying to police and that the district court erred in failing to recognize this discretion.[3]

We also conclude that the district court erred in holding this evidence irrelevant. Whether evidence is relevant is an issue of law that we freely review. *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010); *State v. Hairston*, 133 Idaho 496, 502, 988 P.2d 1170, 1176 (1999). "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. Evidence that Jones had previously made false statements to a law enforcement officer would have been relevant as it tends to show a willingness to tell self-serving lies even when doing so is illegal. When addressing the somewhat analogous issue of whether to admit evidence of a felony conviction under I.R.E. 609, the Idaho Supreme Court has held that some crimes, including perjury, are especially relevant to credibility because they are "intimately connected" with that issue and indicate a propensity toward dishonesty. *State v. Thompson*, 132 Idaho 628, 631, 977 P.2d 890, 893 (1999); *State v. Bush*, 131 Idaho 22, 30, 951 P.2d 1249, 1257 (1997); *State v. Ybarra*, 102 Idaho 573, 580, 634 P.2d 435, 442 (1981). Making a false statement to a law enforcement officer, like perjury, is an act that is intimately connected to credibility. In fact, it is itself a crime. I.C. § 18-705. It not only indicates a willingness to be dishonest when it serves one's own interest, but a willingness to defy authority and break the law when doing so.

The State contends that even if providing false information to a police officer may sometimes be relevant to a witness's credibility, here the specific incident was so remote in time

_____

[3]    That is not to say, however, that if Jones denied having lied to police, the defense necessarily would have been allowed to ask him about the misdemeanor conviction. According to one treatise addressing application of corresponding evidence rules of other jurisdictions,

> [I]f the witness stands his ground and denies the alleged misconduct, the examiner must ordinarily "take his answer." That expression does not mean that the cross-examiner may not press further to extract an admission, for instance, by reminding the witness of the penalties for perjury. . . . [O]n cross-examination, the questioner should ask the witness directly and bluntly whether he committed the untruthful act. It is improper to inquire whether the witness was "fired," "disciplined," or "demoted" for the alleged act--those terms smuggle into the record implied hearsay statements by third parties who may lack personal knowledge.

1 KENNETH S. BROUN, MCCORMACK ON EVIDENCE 182-83 (6th ed. 2006).

as to be only marginally relevant and could be excluded without error because the incident occurred in 2003 whereas the Bergeruds' trial was in 2011. For this proposition, the State relies upon this Court's decision in *State v. Downing*, 128 Idaho 149, 911 P.2d 145 (Ct. App. 1996). In that case, the defendant sought to cross-examine the victim, who was fifteen years old when testifying, about false statements she made when she was six or seven years old. This Court affirmed the district court's determination that the alleged childhood fabrications, which occurred eight or nine years prior to trial, were too remote to be probative of the witness's credibility. In *Downing*, it was not the mere passage of time that made the evidence too remote, but "the maturation that occurs between the ages of six and fifteen carries changes in understanding and perception, changes in the ability to distinguish fact from fiction, and changes in 'character.'" *Id.* at 152, 911 P.2d at 148. In the present case, there are no similar factors related to the passage of time that would diminish the probative value of evidence that Jones had previously given false information to law enforcement. Jones was fifty-four years old at the time of trial; it would be absurd to conclude that the ordinary maturation associated with eight years as a middle-aged adult is equivalent to the ordinary maturation which occurs in childhood. Therefore, the passage of time alone did not eliminate the relevance of the evidence.

Having found error, we must determine whether it necessitates a new trial or whether in view of the totality of the trial evidence, the error was harmless. Where defendants have shown trial error, reversal is appropriate unless the appellate court is convinced beyond a reasonable doubt that the violation did not contribute to the jury's verdict. *State v. Perry*, 150 Idaho 209, 227-28, 245 P.3d 961, 979-80 (2010). An error will be deemed harmless if the court is able to say beyond a reasonable doubt that the result of the trial would have been the same if the error had not occurred. *State v. Almaraz*, 154 Idaho 584, 598, 301 P.3d 242, 256 (2013).

The Bergeruds contend that the error is not harmless because the State's evidence did not unequivocally establish that it was the Bergeruds who engaged in manufacturing the methamphetamine found at their home. They point out that the persuasive evidence of methamphetamine production was primarily, if not exclusively, found in the downstairs and outside areas of the home and that the Bergeruds primarily occupied the upstairs while Jones at times occupied the downstairs. In addition, they note the evidence that the iodine and isopropyl alcohol found near an upstairs bathroom, as well as the pseudoephedrine that they purchased, had innocent uses.

Nevertheless, we conclude that the exclusion of evidence showing that Jones had the propensity or willingness to lie did not affect the result of the trial. First, the probative value of the excluded evidence was relatively slight in the context presented here. If the trial court had permitted the Bergeruds to ask Jones whether he had ever lied to the police and if Jones had admitted that he lied, the jury could have inferred that he had a propensity or willingness to lie. But the impact of the inference is muted because the jury was already aware that Jones had a powerful motive to lie in his testimony in this case, for his testimony exculpated himself from criminal conduct. Because the testimony was self-servingly exculpatory, Jones's motive to lie was patent. The admission of evidence that he also had a propensity to lie could have only incrementally heightened the jury's skepticism about his testimony.

Second, even though the Bergeruds' possession of some of the components for methamphetamine manufacturing may have been subject to innocent explanation, collectively the evidence presented a compelling case for the prosecution. The Bergeruds purchased approximately 2,500 pseudoephedrine pills between January 2009 and July 2010. All of the other principal ingredients for methamphetamine production were found in or about the Bergeruds' home, and they admitted to ownership of all of those ingredients other than the matchbooks with striker plates removed. The muriatic acid that Daniel Bergerud claimed to have used only to clean stones was found stored under a deck right beside a plastic container holding white sludge that was likely a product of methamphetamine manufacturing. The defense witnesses' testimony about the lack of a methamphetamine odor at the Bergeruds' residence is of little exculpatory value, for this evidence related to times that were days or weeks prior to the discovery of methamphetamine in the residence. The trial evidence indicated that methamphetamine can be manufactured in eight hours or less. Further, evidence of the absence of a methamphetamine odor would tend to show that methamphetamine was not produced at all, but that is plainly contradicted by overwhelming evidence that production did occur at the Bergerud residence, including iodine stains in the shed and the matchbook covers and methamphetamine solution found inside the home. The State's witnesses testified that methamphetamine manufacturing causes a strong odor and one that was very apparent inside the Bergeruds' home when the police conducted the search. Thus, the Bergeruds' implication that Jones was manufacturing methamphetamine at their home without their knowledge is unconvincing because it included no explanation of how they could have failed to notice the odor

when the production occurred. In addition, the Bergeruds' version of events would require belief that when Jones moved out of the residence, he left behind a jar of partially processed methamphetamine, a highly unlikely scenario given the risks associated with methamphetamine manufacturing and the value of the end product.

Lastly, Daniel admitted that he had used methamphetamine and possessed a pipe that he had made for that purpose. His testimony that he had used the drug only on one day, that he was deeply ashamed of this, and that he did not intend ever to use it again was significantly undercut by his further admission that he had cleaned the methamphetamine pipe and kept it in a safe place until it was found by police. The jury likely would find it improbable that a person who used methamphetamine only on one day and never intended to use it again would carefully maintain and store a methamphetamine pipe rather than discard it. Thus, the evidence suggested that Daniel's methamphetamine use exceeded the amount he admitted and that his use created a significant motivation for him to manufacture methamphetamine.

In view of the strength of the State's evidence against the Bergeruds, and the implausibility of the Bergeruds' defense that they were unaware of the methamphetamine manufacturing operation that was plainly being conducted at their home, we conclude that the error in excluding evidence that Jones had previously lied to police was harmless beyond a reasonable doubt. Therefore, the Bergeruds' judgments of conviction and sentences are affirmed.

Judge GRATTON and Judge MELANSON **CONCUR.**