23 P.3d 786

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Lanny SMITH, Defendant–Appellant.**

No. 23515.

Court of Appeals of Idaho.

Jan. 30, 2001.

Review Denied May 21, 2001.

714

Weinpel, Woolf & Combo, Idaho Falls, for appellant. Stevan H. Thompson argued.

Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

SCHWARTZMAN, Chief Judge.

Lanny Smith appeals from his conviction for two counts of murder in the first degree and burglary. On appeal, Smith challenges the appointment of the special prosecutors, their presentation of evidence to the grand jury, and the admission of testimony from a jailhouse informant, as well as alleging a number of trial errors that he claims denied him his right to a fair trial. For the reasons set forth below, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On Tuesday, March 24, 1992, Leo and Mary Downard, an elderly married couple, were found shot to death in their home in Ammon, Idaho. Leo's body was discovered in the living room. He had been shot in the chest, the bullet piercing his heart; another shot had grazed his head; a third shot had entered his head from extremely close range behind the right ear. Mary's body was found in her bedroom. She had been shot three times in the head, with the final shot having been fired from extremely close range behind her left ear. There was no evidence of forced entry or robbery.

The police investigation indicated that Jeff Smith (Jeff), Lanny's brother, was one of the last persons to see the Downards alive. He had borrowed their truck on the previous Saturday to transport a rented power rake to do yard work for them and others and had left in his blue Ford Mustang from the Downard home at about 6:30 that evening. Originally, Jeff was charged with the murders. The case against Jeff was dismissed, however, at the preliminary hearing stage.

Approximately eighteen months after the case against Jeff was dismissed, Lanny Smith was indicted for the murders and for burglary. At the request of the Bonneville County Prosecutor, special deputy prosecuting attorneys were appointed to handle prosecution of the case. Smith's defense counsel filed a motion to dismiss the indictment and to quash the order appointing special prosecutors based upon the state's alleged failure to comply with the statutes governing appointment of special prosecutors. Smith's motion was supported by an affidavit of counsel attacking the factual reasons asserted by the elected prosecutor for appointment of special prosecutors. The district court denied the motion, concluding that the prosecutor's reasons for requesting appointment of special prosecutors—that his heavy caseload would

preclude him from properly attending to all of the cases—did not amount to an abdication of his role. Thereafter, the court concluded that the special prosecutors possessed the right to present the case against Smith to the grand jury. Finally, the court concluded that Smith's due process rights were not violated by the appointment of the special prosecutors and that Smith could not disqualify either special prosecutor by virtue of his position as a prosecutor in another county.[1]

Counsel for Smith filed a motion to dismiss the indictment based upon alleged misconduct by special prosecutor Rosenthal— vouching for the credibility of witnesses and permitting witnesses to testify beyond their expertise and competence before the grand jury.

Smith also filed a motion *in limine* seeking an order prohibiting, among other things, testimony of Beverly Huffaker about Smith's alleged preference for heavy-set, grandmotherly-looking women. The district court ruled that testimony in this regard was relevant, probative and did not violate I.R.E. 404 (prohibiting the introduction of propensity evidence) because the evidence—Smith's preference for larger grandmotherly women—was not character evidence.

In anticipation of a March 1, 1996 trial date, counsel for Smith filed a motion objecting to the late disclosure of Eric Greenwade, a scientist at the Idaho National Engineering Laboratory, as an expert witness to testify about the size of shoe that left a foot print in the Downard home. The state responded, explaining that the defense was timely informed about Greenwade.

At trial, the state presented evidence and testimony from several experts that Smith's .22–caliber rifle was the murder weapon, and that a shoe print left in the Downards' home came from a shoe belonging to Smith. Consistent with the state's theory of the case, the state also presented evidence that Smith was interested in older heavy-set women like Mrs. Downard. Other testimony placed

Smith near the Downards' home on the day of and in the days following the murders. A jailhouse inmate testified that Smith admitted to killing the Downards.

The defense, through cross-examination and calling of witness, presented evidence to suggest that Jeff had shot the Downards because he was angry with them for refusing to let him continue to borrow their truck. The defense theorized that Jeff had stolen Smith's rifle, that he wore shoes of the same brand, albeit a size larger—9½ rather than 8½ —and that he had a violent temper.

The jury returned a verdict of guilty to two counts of murder in the first degree and one count of burglary, and found that Smith had used a firearm in the commission of his crimes. Thereafter the state filed notice of aggravating factors requisite to application of the death penalty.

Prior to sentencing, Smith entered into a sentencing agreement with the state, and pursuant to that agreement, the court sentenced Smith to concurrent terms of fixed life imprisonment on both counts of murder in the first degree, enhanced by fifteen years fixed for use of a firearm, and a ten year fixed term for burglary, enhanced by five years fixed for use of a firearm. Smith appeals.

## II.

### THE DISTRICT COURT'S DENIAL OF SMITH'S MOTION TO QUASH THE GRAND JURY INDICTMENT CLAIMING UNLAWFUL APPOINTMENT OF THE SPECIAL PROSECUTORS AND ALLEGED IMPROPRIETIES IN THE PRESENTATION OF EVIDENCE TO THE GRAND JURY

Counsel for Smith filed motions to dismiss the indictment on the grounds that the appointment of the special prosecutors was contrary to state law and that there were evidentiary defects in the grand jury process.[2]

---

1. The special prosecutors were Jay Rosenthal, a deputy prosecutor in Ada County, and Tom Moss, the prosecutor of Bingham County.

2. These alleged defects included the presentation of testimony by Smith's mother, who was later found incompetent to testify at trial; allegedly untruthful testimony by Detective Rodriguez

The district court held hearings on July 28 and August 23 of 1995, at which Huffaker and Rodriguez testified and were examined about their grand jury testimony.

■ Regarding the appointment of special prosecutors, the district court denied Smith's motion to dismiss the grand jury indictment in a well-reasoned memorandum decision, explaining that the local prosecutor's reasons for seeking appointment of special prosecutors did not amount to an abdication of his duties and that his assertion that, in view of his heavy case load, he would be unable to adequately investigate and prosecute the instant case, met the statutory requirement of the prosecutor being "unable to attend to his duties." The district court went on to explain that, if the appointments were irregular, under the *de facto* officer doctrine, the special prosecutors had the same powers as a duly elected or appointed prosecutor, and that neither Moss nor Rosenthal were disqualified by reason of their other public positions.[3] Finally, the court concluded that the appointments did not prejudice Smith.

■ We note that the petition for appointment of special prosecutors came from the elected prosecutor, not the court or the county commissioners as in *Newman v. Lance,* 129 Idaho 98, 101, 922 P.2d 395, 398 (1996). Furthermore, the prosecutor's request for such appointments, here due to a large number of pending murder cases and insufficient staff to handle them, is a matter squarely within the elected prosecutor's discretion as a public officer, employer and manager. Smith's theories about other reasons for the prosecutor's request—such as his claim that the Sheriff and County Commissioners forced him to do so because of their lack of confidence in his abilities—are wholly unsupported by the record and pure

speculation. In the absence of objective facts rebutting the prosecutor's reasons for the request, and factual findings at the trial court level, we will not review the prosecutor's reasons for seeking appointment of special prosecutors.

■ In *State v. Arrasmith,* 132 Idaho 33, 48, 966 P.2d 33, 48 (Ct.App.1998), this Court declined to review the appointment of a special deputy prosecutor outside of the provisions of the special prosecutor statute, I.C. § 31–2603(b). Our Supreme Court, in *State v. Bell,* 84 Idaho 153, 159–60, 370 P.2d 508, 511–12 (1962), held that, in the absence of showing that a defendant was denied a fair trial, the appointment and participation of a special prosecutor is not subject to collateral attack. From our review of the record, we conclude that the appointment of the special prosecutors did not deny Smith a fair trial.

■ Regarding the second part of Smith's claim—that improper evidence was received before the grand jury—we note that challenges to the grand jury proceeding may not generally be reviewed on appeal because such defects must be deemed harmless once the defendant has received a full trial on the merits and has been found guilty beyond a reasonable doubt by a petit jury. The Idaho appellate courts have long followed such a rule of nonreview with respect to certain defects in preliminary hearings. *See State v. Pratt,* 125 Idaho 546, 556, 873 P.2d 800, 810 (1993) (errors connected with the preliminary hearing afford no basis for relief after conviction following a fair trial); *State v. Kuzmichev,* 132 Idaho 536, 544, 976 P.2d 462, 470 (1999). In *State v. Nelson,* 131 Idaho 210, 214–15, 953 P.2d 650, 654–55 (Ct.App.1998) and *State v. Kilby,* 130 Idaho 747, 947 P.2d 420 (Ct.App.1997), we extended this analysis to grand jury proceedings, holding that al-

about the date when expert witness Greenwade was hired by the prosecution; and allegedly inadmissible character evidence contained in Huffaker's testimony.

3. Pursuant to I.C. § 31–2603(a), "the district court may ... appoint some suitable person to perform for the time being, or for the trial of such accused person, the duties of such prosecuting attorney, and the person so appointed has all the powers of the prosecuting attorney, while so acting as such." Where the appointment is irreg-

ular in a technical manner, the *de facto* officer doctrine provides that the acts of the special prosecutor are deemed to be those of a duly elected or appointed prosecutor. *See State v. Bacon,* 117 Idaho 679, 681–82, 791 P.2d 429, 431–32 (1990); *State v. Corcoran,* 7 Idaho 220, 61 P. 1034 (1900) (even if the trial court mistakenly appointed a special prosecutor, his acts were those of an officer *de facto* and were entitled to recognition as such).

leged errors in the admission of evidence before a grand jury would not be examined on appeal if the defendant had been found guilty following a fair trial. *See also United States v. Mechanik,* 475 U.S. 66, 67–72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (procedural error in the grand jury proceedings was not fatal to a conviction because such is rendered harmless by the subsequent petit jury's verdict finding the defendant guilty beyond a reasonable doubt).

Accordingly, we need not review these claimed errors at the grand jury proceeding on this appeal.

### III.

### USE OF COLLATERAL EVIDENCE TO PROVE CHARACTER FOR VIOLENCE

#### A. Introduction

Smith's brother, Jeff, testified for the prosecution. On cross-examination, Smith was allowed to question Jeff about his (Jeff's) reputation and challenge his response with inquiry into prior episodes of violence or criminal conduct. Then, in the defense case-in-chief, Smith sought to further impeach Jeff's testimony about his own reputation through collateral testimony regarding specific instances of conduct. Smith sought to use the testimony of other witnesses to prove that Jeff had (1) as a sixteen year-old brandished a firearm at a neighbor; (2) as an eighteen or twenty year-old raped his first wife and threatened to kill her with a shotgun if she were to leave him; (3) sold a watch to a bartender (apparently an attempt to raise an inference that Jeff is a thief); (4) in 1991 or 1992, drove a company vehicle in a reckless manner and became angry when confronted by his boss; and (5) threatened to use a gun to steal money from a hearing aid shop in 1994. The district court excluded the evidence. The court held that to the extent this testimony was offered to suggest that Jeff was a violent person and therefore was more likely to be the true perpetrator of the Downard murders, the evidence was inadmissible under I.R.E. 404(b), and as im-

peachment evidence, the testimony was inadmissible under I.R.E. 608. The district court also held that the evidence was more prejudicial than probative.[4]

On appeal, Smith does not challenge the district court's ruling that I.R.E. 404(b) would preclude use of the testimony as substantive evidence to show that Jeff was the likely murderer, but argues that the court erred in excluding the third-party testimony for the purpose of impeaching Jeff and showing his lack of credibility.

#### B. Standard Of Review

In *State v. McAbee,* 130 Idaho 517, 518, 943 P.2d 1237, 1238 (Ct.App.1997), this Court explained that the appellate court exercises free review over questions of relevancy, but then must apply an abuse of discretion standard on review of the trial court's weighing of the probative value of the evidence against any unfair prejudicial impact to decide whether the evidence should be admitted. *See also State v. Blackstead,* 126 Idaho 14, 17, 878 P.2d 188, 191 (Ct.App.1994),

#### C. Discussion

■ Idaho Rule of Evidence 404(a) provides, in pertinent part:

(a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

. . .

(3) Character of Witness. Evidence of the character of a witness, as provided in Rules 607, 608 and 609.

Idaho Rule of Evidence 608(b) states:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility, of the witness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into

4. Smith was not prevented from presenting his theory that Jeff was the real killer. Smith did so

through his thorough cross-examination of Jeff and other witnesses.

on cross-examination of the witness concerning (1) the character of the witness for truthfulness or untruthfulness, or (2) the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Under I.R.E. 608(b), extrinsic evidence may not be used to impeach a witness regarding a collateral matter. The express language of I.R.E. 608(b) prohibits impeachment through extrinsic evidence of specific instances of conduct by a witness. *State v. Araiza*, 124 Idaho 82, 92, 856 P.2d 872, 882 (1993). In *Araiza*, the trial court limited the foundation Araiza could lay to support a witness' opinion on a prosecution witness' reputation for truthfulness by precluding him from testifying about specific instances of conduct that formed the basis for that opinion. The Idaho Supreme Court upheld the trial court's ruling, explaining that "if the trial court had allowed Araiza to ask his witness to testify as to the specific instances of the state's witness' conduct supporting the opinion, the trial court would have allowed proof of conduct through extrinsic evidence. This is expressly prohibited by I.R.E. 608(b)." *Id.* There is no distinction to be drawn between *Araiza* and Smith's attempt to impeach Jeff's testimony about his own reputation by use of other witnesses' collateral testimony about specific instances of Jeff's past conduct unrelated to the crime. The trial court correctly ruled that I.R.E. 608 prohibited such impeachment through evidence of collateral matters.

Accordingly, the district court's ruling under I.R.E. 608 is affirmed.

## IV.

## THE ADMISSION OF EXPERT WITNESS TESTIMONY

### A. Standard of Review

■ The admissibility of expert testimony is discretionary with the trial court and, absent an abuse of that discretion, a decision will not be disturbed on appeal. *State v. Merwin*, 131 Idaho 642, 647, 962 P.2d 1026, 1031 (1998); *Blackstead*, 126 Idaho at 21, 878 P.2d at 195.

### B. Discussion .

On appeal, Smith argues that the testimony of Martin Ols of the Idaho Forensic Laboratory and Rocky Mink of the Oregon Forensic Laboratory, called to "peer review" Ols' findings, was excessive and lent an air of importance and resolve to the state's case, thereby prejudicing the defense. Our Supreme Court has recently declared that the admission of expert testimony is not subject to a fundamental error analysis because it neither goes to the foundation of the case nor takes from the defendant a right that was essential to his defense. *State v. Moore*, 131 Idaho 814, 822, 965 P.2d 174, 182 (1998); *State v. Bingham*, 116 Idaho 415, 423, 776 P.2d 424, 432 (1989); *State v. Johnson*, 132 Idaho 726, 729, 979 P.2d 128, 131 (Ct.App. 1999). Accordingly we review only the expert testimony admitted over Smith's objections. The record indicates that Smith never challenged the testimony of Ols and Mink as cumulative at trial, and thus we need not reach the actual merits of this claim on appeal.[5]

5. We note, however, legitimate reasons for the state's presentation of both Ols' and Mink's testimony. Ols testified that his comparison of Smith's .22 and the shell casings from the Downard home lead him to conclude that the tool marks on the casings were consistent with firing from Smith's .22. During Ols' testimony about his training in and experience conducting firearms examination, Ols testified that, while he had worked at the F.B.I.'s laboratory, he was not labeled a "qualified firearms examiner" because he was not an agent and that the F.B.I. no longer required firearms examiners to be special agents.

Mink, a criminalist and firearms examiner, testified that the markings left on the .22 caliber casings found in the Downard home were consis-

tent with the marks created by Smith's gun, a Remington Fieldmaster .22. Mink then testified that he was called to testify because Martin Ols, then Idaho's forensic tool marks and firearms examiner, was leaving the State of Idaho for another position. Mink testified that Ols had made a preliminary examination of the suspect weapon and shell casings for the preliminary hearing. He explained that he was given Ols' report, but he conducted his own comparison in an attempt of corroborate Ols' work. Mink also testified that Ols was not classified as a firearms examiner.

Since Ols was subject to attack by Smith for not being a recognized firearms examiner, the state presented Ols' testimony as to the examina-

Next, Smith argues that the testimony of Donna Sheppardson of the Idaho Department of Law Enforcement's Bureau of Forensic Services and Eric Greenwade, an Idaho National Engineering Laboratory mathematician and visual image analyst, was cumulative; and that Greenwade, in testifying about features of Smith's shoe that matched the footprint in the Downard residence, was allowed to testify outside his area of expertise. Smith also argues that the state was late in disclosing Greenwade as an expert witness.

Greenwade was retained as an expert to correct the photo of the footprint for scale and camera angle. He testified that he measured the floorboards of the hardwood floor upon which the footprint was found and photographed, using the corners of the wood slats as points of reference. Smith stipulated that digital image warping is a recognized method of correcting for camera angle. After explaining his method and the mathematics behind it, Greenwade further testified that he examined both Jeff's shoe (a 9½) and Smith's shoe (an 8½), compared them to the computer enhanced and corrected photograph he had made through digital image warping, and concluded that Smith's shoe sole print was an extremely close match. The defense objected, arguing that Greenwade was not a qualified footwear expert and should not be allowed to testify to whether a particular shoe made the shoeprint. The district court ruled that, because Greenwade was a qualified expert on enhancing and analyzing images, his testimony about whether a particular shoe appeared to more closely match the enhanced shoe print went to the weight the jury might give to his testimony, not its admissibility. Greenwade then testified that the print was not made by a size 9½ shoe. Greenwade admitted that he was not a footwear expert and was not certain about what size of Footjoy brand shoe had made the shoeprint.

Sheppardson, a qualified footwear expert, testified that she had compared both Smith's size 8½ Footjoy shoe and Jeff's size 9½ Footjoy shoe to the digitally enhanced photo-

graph. She then testified that she could not eliminate Smith's shoe, but had eliminated Jeff's larger shoe, as the one that had left the footprint in the Downard home.

■ The record reveals legitimate reasons for the state's presentation of both Greenwade's and Sheppardson's testimony. The state offered Greenwade's testimony as to the image correction and analysis he conducted and its comparison to Smith and Jeff's shoe soles. Then, since Greenwade was subject to attack by Smith for not being an expert on the examination of footwear, the state sought to bolster his conclusions with corroboration from a recognized footwear examiner. At most, the testimony of Sheppardson was corroborative of Greenwade's work, not cumulative. Accordingly, Smith's challenge is rejected.

Next, Smith argues that the state was late in disclosing Greenwade as a witness. However, contrary to Smith's claim, the record reflects that Greenwade was disclosed as a witness on November 22, 1995, two days before the deadline set by the court. Moreover, Smith failed to show that he was prejudiced by the supposed late disclosure of Greenwade. Accordingly, this issue does not entitle Smith to any relief on appeal.

■ Finally, Smith argues that the court erred in allowing Tom Bevel of the Oklahoma City Police Department to testify about the order of the shots that killed the Downards. Bevel, a blood splatter expert, testified that based upon bullet path and blood splatter on the floor, walls and furniture, each of the three shots to each victim were fired from different locations and had different trajectories. According to Bevel, the last shot fired into each victim was the close contact wound to the head behind the ear. Bevel was unable to identify which of the other two shots was fired first. The district court overruled Smith's objection that Bevel's testimony was irrelevant, concluding that evidence of the order and timing of the shots was probative of malice and intent to kill. We agree with the district court.

tion he conducted on the suspect weapon itself and then sought to bolster his conclusions with

corroboration from a recognized firearms examiner.

In conclusion, we affirm the district court's evidentiary rulings regarding testimony of the state's expert witnesses.

## V.

### SMITH'S RIGHT TO DUE PROCESS IN PREPARING A DEFENSE WAS NOT VIOLATED BY THE STATE OR BY THE DISTRICT COURT

#### A. Standard of Review

■ Where a defendant claims that his right to due process was violated, we defer to the trial court's findings of fact, if supported by substantial evidence. *State v. Avelar*, 124 Idaho 317, 322, 859 P.2d 353, 358, (Ct.App. 1993). However, we freely review the application of constitutional principles to those facts found. *Id.*

#### B. Discussion

■ Smith alleged that Detective Rodriguez told Beverly Huffaker not to speak with defense investigators and that, as a result, Smith was unfairly surprised at trial when her testimony differed from that given before the grand jury. Smith alleged that Rodriguez's admonition to Huffaker was part of a campaign by him to get witnesses to change their testimony.

On July 28, 1995, nearly eight months prior to trial, the district court held a hearing at which Smith's investigator, Huffaker, her son Scott, and Detective Rodriguez were extensively examined. During the examination of Huffaker, she said that she thought Rodriguez had told her not to talk to Smith's investigators. Special Prosecutor Moss then specifically instructed Huffaker that, while she should not talk about the grand jury, she could speak with whom she pleased about the case, including Smith's investigators. Afterwards, the district court ruled that there was no basis for Smith's allegations of misconduct by the special prosecutors.

On appeal, Smith has failed to show that he was in any way prejudiced by Rodriguez's conduct with Huffaker, and he has not identified any other witnesses with whom he was unable to conduct interviews. Additionally, Smith has failed to show that he was in any way prevented from interviewing Huffaker thereafter, other than by her independent decision not to speak to him. Thus, Smith's due process violation claim fails.[6]

■ Finally, Smith argues that the district court erred by forcing him to provide to the state transcripts of witness interviews conducted by Smith's investigators. At a pretrial hearing the issue of the defense's discovery obligations under I.C.R. 16 was considered and, in reference thereto, the following colloquy took place:

> [Court:] Anything you are going to use at trial, tangible objects, he gets to see. Do you have any of that stuff?
>
> . . .
>
> [Counsel for Smith:] We have some additional transcripts that [the state] is talking about. But to be honest, Your Honor, we're now wondering if we really have to give the transcripts [defense investigator's secretly tape recorded conversations with state witnesses] under Rule 16.
>
> . . .
>
> [Court:] We'll, here's where the rubber hits the road. Any tangible objects or documents you intend to use at the time of trial you have to turn over. That is clear under [Idaho Criminal] Rule 16.
>
> [Counsel for Smith:] Does that include transcripts that we may use in cross-examination?
>
> . . .
>
> That is not a document that will be admitted.
>
> [Court:] That is covered in *United States v. Nobles*, 422 U.S. 2[422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141] (1975), where the Supreme Court allowed the investigative reports by the Defendant to be turned over to the Prosecutor prior to testimony. And they specifically found it was not a violation of the Fifth or Sixth Amendment

---

**6.** Smith also claimed that his right to due process was violated by late disclosure of exhibit 86—a receipt for the purchase of a gun by Huffaker's son. However, since Smith has failed to present any argument or authority in support of this claim, it will not be reviewed on appeal. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

to the United States Constitution. That is why in the defense manual it always says take oral statements.

[Counsel for Smith:] ... we are not going to be admitting the stuff in evidence, but using it for impeachment and cross-examination.

[Court:] Well, if you intend to introduce it at time of trial—it has been kind of a battleground. But like I say, *United States v. Nobles; Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); and *Jones v. Superior Court,* 58 Cal.2d 56, 22 Cal.Rptr. 879, 372 P.2d 919 [(Cal. 1962).]

So if you intend to use it at trial and its in written form they get to see it. Now, like I say, we can quibble about when you have to produce it, but it's before they testify.

Smith makes no reference to an order to disclose, nor did Smith seek a protective order to prevent disclosure. From the above colloquy, we conclude that Smith was not ordered to turn over specific transcripts, just to disclose transcripts of taped interviews with state's witnesses before using that material at trial. This ruling is consistent with I.C.R. 16(c)(1), requiring the defendant to disclose documents that the defendant seeks to introduce into evidence at trial. *See also* I.R.E. 612, providing that the adverse party is entitled to have produced at trial a writing used to refresh the memory of a witness. Because the court did not mandate Smith's disclosure of specific transcripts, Smith's claim that he was "compelled" to disclose work product is not borne out by the record. Furthermore, he has failed to show that his defense was prejudiced in any way.

## VI.

## EVIDENCE OF SMITH'S ATTRACTION TO THE VICTIM

### A. Introduction

Huffaker testified that Smith had repeatedly told her that he liked older, heavier, grandmotherly-looking women. After the Downards were killed, Smith commented to Huffaker that she resembled Mrs. Downard, comparing their hands, bodies, perfume and bedroom décor. Smith gave Huffaker a bathrobe he said was like the one Mrs. Downard had. Smith also admitted to Huffaker that he had been at the Downard's home on the day they were killed.

Smith alleges that the trial court erred in admitting Huffaker's testimony because it was prohibited by I.R.E. 404(b), and argues that the admission of this evidence prejudiced him. The state responds that the district court correctly concluded that Huffaker's testimony about Smith's interest in older, heavy-set women was relevant to motive, identity and intent, and was more probative than prejudicial.[7]

### B. Standard Of Review

 The analysis of admissibility of other crimes, wrongs or acts under I.R.E. 404(b) is two pronged:

First, the evidence must be relevant to a material and disputed issue concerning the crime charged. *State v. Moore,* 120 Idaho 743, 745, 819 P.2d 1143, 1145 (1991). Whether evidence is relevant is an issue of law. *State v. Raudebaugh,* 124 Idaho 758, 864 P.2d 596 (1993). Therefore, when considering a district court's admission of evidence of prior misconduct, we exercise free review of the trial judge's relevancy determination. The second step in the analysis is the determination that the probative value of the evidence is [substantially] outweighed by [the danger of] unfair prejudice. When reviewing this step we use an abuse of discretion standard. *State v. Atkinson,* 124 Idaho 816, 819, 864 P.2d 654, 657 (Ct.App.1993).

*State v. Pilik,* 129 Idaho 50, 53, 921 P.2d 750, 753 (Ct.App.1996)

### C. Discussion

Idaho Rule of Evidence 404(b) is a rule of exclusion. It generally prevents the admission of previous acts to establish a person's character for the purpose of showing that the person acted in conformity with that charac-

---

7. Apparently, the state theorized that Smith had touched Mrs. Downard in an inappropriate man-

ner, she objected, Smith felt rejected and this rejection was the motive for the killings.

ter in a given situation. At trial, the district court ruled that Huffaker's testimony regarding Smith's affinity for older, heavy-chested women and his comments to Huffaker about how she resembled Mrs. Downard, had the same robe, pretty hands, etc., was arguably relevant to support the state's theory of motive, identity and intent. The court further concluded that while the evidence was thus admissible under I.R.E. 404(b), it was *not* in fact bad acts evidence. Finally, the court concluded that the evidence was more probative of motive and identity in this case than it was prejudicial.

■■■■ On appeal, Smith has failed to show that the evidence violated I.R.E. 404(b). We hold that Huffaker's testimony about Smith's preference for older, heavy-set women and his infatuation with Mrs. Downard was not in itself evidence of a crime, wrong or act of Smith to prove he acted in conformity therewith. Rather, Huffaker's testimony was relevant to establishing a possible motive and intent on Smith's part. We further hold that the district court did not abuse its discretion in concluding that the probative value of the questioned evidence was not substantially outweighed by the danger of unfair prejudice. *State v. Medina*, 128 Idaho 19, 23–24, 909 P.2d 637, 641–42 (Ct.App.1996).

## VII.

### ADMISSION OF JAILHOUSE INFORMANT TESTIMONY

■■■ Smith argues that the district court erred in admitting a jailhouse inmate's testimony about conversations with Smith in which Smith admitted to killing the Downards. Smith attacks the admissibility of that testimony, arguing that a jailhouse informant should be presumed a liar unless the state first establishes that the testimony is more probably true than not.[8] Since Smith presents this issue without citation to any authority, we accordingly need not address it. *Zichko*, 129 Idaho at 263, 923 P.2d at 970.

8. The fact that a witness is a jailhouse informant goes to weight and credibility of his or her testimony, not competency. *See State v. Kuzmichev*, 132 Idaho 536, 541–42, 976 P.2d 462, 467–68

## VIII.

### THE STATE DID NOT COMMIT ERROR IN CLOSING ARGUMENT

Finally, Smith contends that in closing argument the state impermissibly vouched for the credibility of Jeff, Huffaker, Rodriguez, and Greenwade and commented on evidence not in the record by stating that it was unchallenged that Smith had a fixation on Mrs. Downard. The state responds that Smith failed to object during its closing argument and that the state's conduct did not constitute fundamental error.

■■■ Where defense counsel does not object during closing, this Court will review the propriety of any comments made only if they constituted fundamental error. *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990). Error is fundamental when "the comments were so egregious or inflammatory that any prejudice arising therefrom could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *Id. State v. Hairston*, 133 Idaho 496, 513, 988 P.2d 1170, 1187 (1999); *State v. Lovelass*, 133 Idaho 160, 167, 983 P.2d 233, 240 (Ct.App.1999).

From our review of the state's closing argument, the special prosecutor never stated a personal opinion as to the credibility of any witness, let alone an opinion about credibility not based upon the evidence or inferences therefrom. *See State v. Garcia*, 100 Idaho 108, 110–111, 594 P.2d 146, 148–49 (1979). The state's opening and closing statements fall squarely within the proper scope of such—discussion of what the witness was to say (in opening) or said (closing) and why it will be or was important. There is no error, much less fundamental error, here. Accordingly, Smith's challenge to the state's opening and closing statements fails.

## IX

### CONCLUSION

The district court did not err in denying Smith's motion to dismiss the indictment,

(1999); *State v. Fields*, 127 Idaho 904, 910, 908 P.2d 1211, 1217 (1995); *State v. Bainbridge*, 117 Idaho 245, 254–56, 787 P.2d 231, 240–42 (1990).

723

refusing to admit extrinsic evidence to prove specific incidents of Jeff's prior conduct in an effort to impeach, overruling Smith's objections to the testimony of the state's experts, and admitting testimony that Smith was interested in older, heavy-set women. Accordingly, Smith's convictions for two counts of murder and one count of burglary are affirmed.

Judge LANSING and Judge Pro Tem HARDING, concur.