IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 36806

STATE OF IDAHO,          )
          )    **2011 Opinion No. 55**
    Plaintiff-Respondent,    )
          )    **Filed: September 8, 2011**
v.          )
          )    **Stephen W. Kenyon, Clerk**
JEFFREY MARSALIS,          )
          )
    Defendant-Appellant.    )
          )

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Daniel C. Hurlbutt, District Judge.

Order denying motion to dismiss indictment, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Sarah E. Tompkins, Deputy Appellate Public Defender, Boise, for appellant. Sarah E. Tompkins argued.

Hon. Lawrence G. Wasden, Attorney General; Nicole L. Schafer, Deputy Attorney General, Boise, for respondent. Nicole L. Schafer argued.

_____

LANSING, Judge

Jeffrey Marsalis was convicted of rape after the district court denied his motion to dismiss the indictment. On appeal, Marsalis contends his motion to dismiss should have been granted on the grounds that the State relied on perjured testimony in the grand jury proceedings and that the State's evidence did not establish probable cause for issuance of the indictment. We affirm.

## I.

## FACTS AND PROCEDURE

The following facts were shown by testimony before the grand jury. Marsalis and K.G., who became acquainted through their work at Sun Valley, arranged to go to a bar in Ketchum for a drink. Having already consumed one beer, K.G. rode with Marsalis to the bar, where they each drank a beer. Marsalis told K.G. that she was prettier than her sister, which made K.G.

uncomfortable because it gave her the impression that Marsalis believed they were on a date. She testified that she was not interested in Marsalis as a sexual partner.

After the two finished their beers, Marsalis ordered a shot of liquor for each of them and refused to tell K.G. what was in it. She testified that the drink had a slightly bitter or salty taste and that there was a grainy substance left on the bottom of the glass. After a trip to the restroom, K.G. drank another beer that Marsalis had ordered for her. She testified that after drinking this beer, her recollection became spotty which was unusual because she could normally drink three to four beers and a shot of alcohol without experiencing memory problems. Testimony of the bartender established that Marsalis had ordered a total of twenty beers and four shots for the two of them, and K.G. had also ordered a few beers for herself.

Following several hours of drinking, Marsalis and K.G. took a cab back to Sun Valley. The cab driver testified that K.G. appeared to be very intoxicated and that during the ride, she was curled up with her eyes closed. The driver also said that Marsalis had a difficult time rousing K.G. and getting her out of the cab once they reached their destination--Marsalis' condominium building.

K.G. testified that she had no recollection of how she left the bar or came to find herself at Marsalis' residence, where she woke up the next morning. Upon waking, she did not know where she was and saw that Marsalis was in bed next to her. She was sick and vomited several times that morning, felt pain when urinating, and felt like her vagina was "bruised." She also noticed that her clothes had been put on in a different order than she remembered wearing them the night before.

K.G. spent the rest of the day feeling sick. That night she reported to Ketchum police officers that she thought she had been raped, and she then went to a hospital where samples of her blood and urine were taken. Sun Valley Police Lieutenant Michael Crawford began to investigate the incident and executed a search warrant on Marsalis' residence. He testified that several items were taken from the residence for testing, including a small container for Listerine breath-freshener strips, which he indicated had a white, powdery substance inside.

Marsalis was arrested for rape, and the State sought an indictment from a grand jury. While Blaine County Deputy Prosecutor Warren Christiansen was questioning Lt. Crawford in front of the grand jury, the following exchange occurred after Lt. Crawford indicated that several

items seized from Marsalis' residence, including the small breath-strip container with a white powdery substance inside, had been sent to a laboratory for testing:

[Prosecutor Christiansen]: Now, have you received any test results back on this testing?

[Lt. Crawford]: On the sexual abuse evidence kit we did receive back a finding on the urine that was negative for narcotics. We're still waiting for further testing for other kinds of date rape drugs.

[Prosecutor Christiansen]: Okay. What about the Listerine strips pack with the white substance in it?

[Lt. Crawford]: It came back that there was not enough sample to be tested, not enough white powdery substance to make a test.

[Prosecutor Christiansen]: So nothing conclusive as to what that was?

[Lt. Crawford]: Right.

After the grand jury indicted Marsalis for rape, he filed a motion to dismiss the indictment on the ground that it had been issued in reliance on perjured testimony from Lt. Crawford, and without this untruthful testimony, the evidence did not establish probable cause to charge Marsalis with rape. The perjury claim challenged Lt. Crawford's testimony that the tests on the substance in the breath-strip container were inconclusive due to an insufficient sample. In support of his motion, Marsalis presented evidence that five months before the grand jury proceedings, both the prosecutor's office and Lt. Crawford's office had received the forensic test results that conclusively determined that no controlled substances or date rape drugs were present in the breath-strip package. Marsalis argued that, given the centrality of this evidence to the State's theory that Marsalis had raped K.G. after rendering her unconscious through the administration of a date rape drug, the State had procured its indictment through perjured or false testimony and thereby violated Marsalis' right to due process.

At the hearing on Marsalis' motion, Lt. Crawford testified that before his grand jury testimony, he had not been aware of the results of the forensic testing of the breath-strip package, had not personally seen the lab report, and had not talked to the prosecutor about the test. He also testified that before his office received the test report, technicians at the laboratory had told

him that there probably was not a sufficient amount of the white substance on the package to get a definitive test. He admitted that his testimony to the grand jury was inaccurate and that the actual test results were in the case file prior to his grand jury testimony. He denied, however, that his testimony was knowingly false and stated that he was not aware of his mistake until shortly before the hearing on the motion to dismiss the indictment, when he was alerted to the discrepancy by the prosecutor's office. Lt. Crawford acknowledged that he was the lead investigator on the case, and although he had reviewed the case file before testifying before the grand jury, due to an oversight he had not reviewed the lab report. He stated that he took "responsibility for missing those results." He said that when testifying before the grand jury, using the term "it came back," he was referring to the conversation that he had with the lab employee who said there was likely not enough substance to test and that he had not known that the actual test results "existed." He denied ever discussing the test results with the prosecutor before Marsalis' motion to dismiss the indictment was filed. No testimony was presented from Deputy Prosecutor Christiansen, and there is no other evidence showing whether he was actually conscious of the inaccuracy of Lt. Crawford's testimony when it was presented to the grand jury.

The district court denied Marsalis' motion. The court found that "both the police and the prosecutor knew that the Listerine container held a sufficient sample for testing and that the result of that test was negative, not inconclusive[,]" but held that Prosecutor Christiansen's conduct in failing to correct the officer's testimony was not prejudicial. The court stated:

> In this matter, after considering the totality of the evidence presented to the grand jury, the court cannot conclude that this is an instance where "but for" Crawford's incorrect testimony, the jury would have declined to indict Marsalis. Here, it is unclear exactly why the prosecutor allowed the grand jury to hear Crawford's incorrect testimony or failed to immediately correct it. The state maintains that this error was the result of oversight. Without more, the court cannot find that the state committed perjury or that its misconduct rises to a level warranting dismissal.

The district court also found that the evidence presented to the grand jury, excluding Lt. Crawford's untruthful testimony regarding the breath-strip container, was sufficient to establish probable cause to indict Marsalis for rape. The case proceeded to a jury trial, where additional evidence was presented, including DNA test results showing that semen found during a sexual assault examination of K.G. was from Marsalis. The jury found Marsalis guilty of rape. He now appeals, challenging only the denial of his motion to dismiss the indictment.

4

## II.

## ANALYSIS

The decision to grant or deny a motion to dismiss an indictment based on irregularities in grand jury proceedings is reviewed for an abuse of discretion. *State v. Bujanda-Velazquez*, 129 Idaho 726, 728, 932 P.2d 354, 356 (1997). However, alleged defects in the grand jury process generally will not be reviewed on appeal at all after a defendant has been convicted in a fair trial on the merits. *State v. Grazian*, 144 Idaho 510, 517, 164 P.3d 790, 797 (2007); *State v. Smith*, 135 Idaho 712, 716-17, 23 P.3d 786, 790-91 (Ct. App. 2001); *State v. Nelson*, 131 Idaho 210, 215, 953 P.2d 650, 655 (Ct. App. 1998); *State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997). Marsalis contends that the cases applying this general rule are limited to those instances in which the challenge to the indictment questions the sufficiency of the evidence to support a finding of probable cause or where a defendant alleges that some of the evidence submitted to the grand jury was improperly admitted. He asserts that there exists an exception that allows appellate courts to review grand jury proceedings in instances of prosecutorial misconduct in certain cases even after the defendant has otherwise received a fair trial. The State disputes that such an exception exists in Idaho or that it should be adopted by this Court. We do not resolve the issue, however, for, assuming that the issue is properly presented, Marsalis has not shown that the district court erred in denying his motion to dismiss the indictment.

A collection of statutes and rules govern Idaho grand jury proceedings. Idaho Code § 19-1107 states, "The grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury." Idaho Criminal Rule 6.6(a) discusses the quantum of evidence required to warrant an indictment:

> If it appears to the grand jury after evidence has been presented to it that an offense has been committed and that there is probable cause to believe that the accused committed it, the jury ought to find an indictment. Probable cause exists when the grand jury has before it such evidence as would lead a reasonable person to believe that an offense has been committed and that the accused party has probably committed the offense.

When conducting a review of the propriety of the grand jury proceeding, our inquiry is two-fold. *State v. Martinez*, 125 Idaho 445, 448, 872 P.2d 708, 711 (1994). First, we must determine whether, independent of any inadmissible evidence, the grand jury received legally

5

sufficient evidence to support a finding of probable cause. *Id.*; *State v. Jones*, 125 Idaho 477, 483, 873 P.2d 122, 128 (1994); *State v. Edmonson*, 113 Idaho 230, 236, 743 P.2d 459, 465 (1987). In making this determination, every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment. *State v. Brandsetter*, 127 Idaho 885, 887, 908 P.2d 578, 580 (Ct. App. 1995). Second, even if such legally sufficient evidence was presented, the indictment must be dismissed if prosecutorial misconduct in submitting illegal evidence was so egregious as to be prejudicial.[1] *Martinez*, 125 Idaho at 448, 872 P.2d at 711; *Jones*, 125 Idaho at 483, 873 P.2d at 128; *Edmonson*, 113 Idaho at 237, 743 P.2d at 466. "Prejudicial effect" means "the defendant would not have been indicted but for the misconduct." *Martinez*, 125 Idaho at 448, 872 P.2d at 711; *Edmonson*, 113 Idaho at 237, 743 P.2d at 466. Absent a showing of prejudice by the defendant, we will not second guess the grand jury. *Martinez*, 125 Idaho at 448-49, 872 P.2d at 711-12. To determine whether misconduct is so grievous as to be prejudicial and thus to require dismissal, an appellate court must balance the gravity and seriousness of the misconduct against the extent of the evidence supporting the indictment. *Id.* at 449, 872 P.2d at 712; *Edmonson*, 113 Idaho at 237, 743 P.2d at 466. The *Edmonson* Court further elaborated on the applicable balancing test:

> To determine whether misconduct gives rise to a dismissal, a reviewing court will have to balance the gravity and the seriousness of this misconduct with the sufficiency of the evidence supporting the probable cause finding. At one extreme, the misconduct can be so outrageous that regardless of the extent of probable cause evidence, dismissal will be required. At the other extreme, the misconduct may be so slight, that it becomes unnecessary to question the independent judgment of the grand jury. In the middle of these extremes, the court must examine the totality of the circumstances to determine whether the indictment should be dismissed. As stated above, the burden rests with the criminal defendant to make an initial showing that the misconduct rises to the level of prejudice. Absent the showing of prejudice, a reviewing court will not second guess the grand jury. However, once the defendant does affirmatively prove prejudice, the court must dismiss.

*Edmonson*, 113 Idaho at 237, 743 P.2d at 466. Generally, prosecutorial misconduct will require dismissal only if it reaches the level of a constitutional due process violation. *Id.*

---

[1] The State does not dispute Marsalis' assertion that it amounted to prosecutorial misconduct in this instance for Christiansen to allow Lt. Crawford's incorrect testimony.

Here, the State requested that the grand jury indict Marsalis under two subsections of Idaho's rape statute requiring that the act of penetration occurred when K.G. was either "unable to resist due to any intoxicating, narcotic, or anaesthetic substance," I.C. § 18-6101(5), or was "unconscious of the nature of the act," because she was "unconscious or asleep" and/or "was not aware, knowing, perceiving, or cognizant that the act occurred," I.C. § 18-6101(6)(a), (b). Thus, we assess the grand jury proceedings in light of the State's burden to present evidence showing probable cause to believe (1) that there was penetration and (2) that K.G. was rendered incapable of resisting or that she was unconscious at the time of the act.

## A. Probable Cause

In contending that there was not sufficient evidence presented for a finding of probable cause absent the false testimony, Marsalis asserts the State's "theme" of the case as presented to the grand jury was that Marsalis had administered a date rape drug--other than alcohol--in order to incapacitate K.G. and facilitate the rape. He argues that the only possible physical evidence to corroborate this theory was the testimony regarding the "white residue" seen on breath-strip package, coupled with Lt. Crawford's false testimony about the test results which "left open a window in the jurors' minds as to whether this item actually did contain residue of a date rape drug, albeit in an amount that was insufficient for scientific testing." Marsalis also contends that there was insufficient evidence of sexual intercourse given that test results disclosing the presence of Marsalis' semen had not been received at the time of the grand jury proceedings. This weakness in the State's case was papered over, he argues, by the State's innuendo that Marsalis had used a drug in order to incapacitate K.G.

We are unpersuaded by Marsalis' contention that, with the false testimony excluded, there was insufficient evidence to support a probable cause finding by the grand jury. Probable cause to believe penetration occurred is found in K.G.'s testimony that when she awoke her clothes were on in a different order than she remembered; urination was painful; her vagina felt bruised (a sensation she had never felt before although she had engaged in sexual intercourse before); and that, although she had passed out and did not remember what occurred, she vaguely remembered seeing Marsalis over her on the bed after she passed out. The bartender's testimony as to the number of drinks ordered by Marsalis and K.G. and the taxi driver's testimony about her state of unconsciousness corroborated K.G.'s testimony and explained how intercourse may have occurred without K.G. remembering it. There was also testimony by the state forensic

expert that excessive alcohol as well as date rape drugs can render a person unconscious. Lt. Crawford also testified that when Marsalis was confronted with the allegation that he had engaged in sexual intercourse with K.G. while she was unconscious or close to it, he responded in varying ways, including saying "[t]o the best of my knowledge I do not recall," and "she was never unconscious," and saying that he was not willing to confirm or deny whether he had sex with K.G. until he was able to speak with her.

Marsalis dwells on the lack of support for the State's theory of administration of a date rape drug once the false testimony is excluded. However, it is not an element of the crime that a date rape drug was used--the State needed only show that K.G. was unconscious during the act, regardless of the cause. In any event, there was evidence of a date rape drug quite apart from the inference from Lt. Crawford's inaccurate testimony about the breath-strip container, specifically K.G.'s testimony that the shot of liquor that Marsalis ordered for her tasted salty or bitter and left a granular substance in the bottom of the glass.

We conclude the grand jury was presented with abundant proper evidence to find probable cause to believe that intercourse occurred and that K.G. was unconscious and/or incapable of resisting at the time because she was intoxicated to the point of unconsciousness or had been given a drug, or a combination of both.

## B.    Prosecutorial Misconduct

We now must consider whether, even with legally sufficient evidence having been presented, the indictment should be dismissed due to prosecutorial misconduct in submitting false evidence. As noted above, prosecutorial misconduct may be so outrageous that dismissal will be required regardless of the extent of the probable cause evidence or so slight as to be deemed inconsequential. Absent either of these extremes, the court must determine whether, under the totality of the circumstances, prosecutorial misconduct was prejudicial. *Edmonson*, 113 Idaho at 237, 743 P.2d at 466. Misconduct is prejudicial if the defendant otherwise would not have been indicted--an inquiry that requires balancing the gravity of the misconduct against the extent of the evidence supporting the probable cause finding. *Id.*

Here, the district court found that both Lt. Crawford and Christiansen knew that the Listerine container contained a sufficient sample for testing and that the result of that test was negative, not inconclusive. Nevertheless, the court concluded that Christiansen's unexplained

failure to correct Lt. Crawford's testimony was not prejudicial because this was not an instance where "but for" the improper testimony, the grand jury would have failed to indict.

We first examine the egregiousness of the misconduct. Marsalis contends that Deputy Prosecutor Christiansen's elicitation of Lt. Crawford's testimony regarding the testing of the breath-strip package was "deliberate," "willful[]," and "knowing," given that the prosecutor's office had in its possession contrary test results for approximately five months in advance of the grand jury proceedings. Although it is entirely clear that both the officer and the prosecutor *should have been* aware of the test results and should have presented them truthfully, the record contains no evidence as to whether Christiansen was *actually* aware of the test results when Lt. Crawford's false testimony was given. The only witness at the hearing on Marsalis' motion to dismiss the indictment was Lt. Crawford, who testified that he had not discussed the test results with the Christiansen and did not know if Christiansen had read the laboratory report. Although the district court found that "both the police and the prosecutor knew that the Listerine container contained a sufficient sample for testing and that the result of that test was negative, not inconclusive," the court also concluded:

> [I]t is unclear exactly why the prosecutor allowed the grand jury to hear Crawford's incorrect testimony or failed to immediately correct it. The State maintains that this error was the result of oversight. Without more, the court cannot find that the State committed perjury or that its misconduct rises to a level warranting dismissal.

The record here supports the district court's conclusion that the evidence did not conclusively show that the State deliberately presented perjured testimony. Thus, without more evidence than is contained on the record here, we cannot assign to this misconduct the level of egregiousness that Marsalis argues on appeal. There has been no showing that the misconduct is so outrageous that regardless of the extent of the probable cause evidence, dismissal is required.

We turn then to the next inquiry--whether the misconduct was prejudicial in the sense that without the false evidence, the grand jury would not have found probable cause for the indictment. It is Marsalis' burden to "affirmatively show that, but for the illegal evidence, he would not have been indicted." *Martinez*, 125 Idaho at 449, 872 P.2d at 712. As we explained above, there was ample admissible evidence to show probable cause to believe that the charged offense occurred. Weighing this factor against the seriousness of the prosecutorial misconduct

9

and its likely effect on the grand jury, we conclude that Marsalis has not shown that, "but for" the misconduct, he would not have been indicted.

We certainly recognize that the presentation of false evidence that occurred here was not insignificant and was inexcusable. However, as our Supreme Court explained in *Edmonson*, 113 Idaho at 237, 743 P.2d at 466, dismissal of an indictment is a "drastic remedy and should be exercised only in extreme and outrageous situations, and therefore, the defendant has a heavy burden" to show prejudice. *See also Jones*, 125 Idaho at 483-44, 873 P.2d at 128-29 (recognizing that the prosecutor's misconduct in revealing privileged and hearsay testimony was not insignificant, but ultimately determining that the misconduct was not prejudicial under *Edmonson's* "but for" test). The district court, in the exercise of its discretion, was justified in finding that Marsalis did not carry that burden here.

The district court's order denying Marsalis' motion to dismiss the indictment is affirmed.

Judge MELANSON **CONCURS.**

Judge GUTIERREZ, **DISSENTING**

I respectfully dissent as to Section II, part B. I would hold the indictment should have been dismissed given the egregiousness of the prosecutorial misconduct and the resulting prejudice.

Regarding the severity of the misconduct, I disagree with the majority's conclusion that it did not reach the level of egregiousness warranting dismissal of the case. While the majority declines to characterize it as such, the record establishes that Lt. Crawford's false testimony in this instance amounted to perjury.[1] Under Idaho law defining perjury, "[a]n unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false." I.C. § 18-5408. *See also State v. Wolfrum,* 145 Idaho 44, 46, 175 P.3d 206, 208 (Ct. App. 2007). Here, Lt. Crawford testified at the hearing on Marsalis's motion to dismiss the indictment that he was told by the lab there *may* have been an insufficient sample of

---

[1]     Idaho Code § 18-5401 states:
> Every person who, having taken an oath that he will testify, declare, depose, or certify truly, before any competent tribunal, legislative committee, officer, or persons in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states as true any material manner which he knows to be false, is guilty of perjury.

the powder in the Listerine packet to allow for forensic testimony, but had not been aware of definitive results either way prior to testifying before the grand jury. Yet, Lt. Crawford testified unequivocally in front of the grand jury that there was not a sufficient sample to test. Not surprisingly, the district court found both Lt. Crawford and Christiansen knew the Listerine container contained a sufficient sample for testing and the result of the test was negative, not inconclusive.

Turning to the prejudicial effect of the false evidence, by the State's own concession at the hearing on Marsalis's motion to dismiss the indictment, the dominant theme of the case presented to the grand jury was that Marsalis administered some form of a date rape drug to K.G. in order to incapacitate her and facilitate the commission of rape. Supporting this theory, Christiansen elicited testimony from K.G. that a shot Marsalis insisted she drink tasted bitter and she noticed a granular substance at the bottom of the glass--which the bartender later testified was not normally found in the drink. Additionally, Lt. Crawford indicated he proceeded with the investigation under the assumption a date rape drug may have been used.

The State especially drove home its point as to the date rape drug theory by presenting extensive, detailed testimony by a forensic scientist from the state laboratory. The forensic scientist, after indicating she possessed "specialized knowledge" with regard to date rape drugs and describing her training and experience in the area, proceeded to discuss the types of date rape drugs in existence; how they are administered in a date rape setting ("covertly" and often in beverages); whether there is any "flavor," color, and/or odor associated with certain date rape drugs; how long they take to dissolve in beverages and to exhibit their effects; whether they leave residue; the goal of their usage; the common physical and mental effects experienced by persons under their influence; how long the effects last; how alcohol impacts their effects; how long they remain in a person's system and detectable in urine and blood; how they eliminate from a person's system; and the effects of date rape drugs on the body as compared to alcohol. In stark contrast, the forensic scientist testified very briefly as to the effects of alcohol alone.

It is also apparent the State deliberately elicited and then emphasized the forensic scientist's testimony in an effort to bolster its date rape drug theory of the case.[2] As indicated

---

[2] I do not imply such deliberate elicitation itself was improper--it certainly is within the prosecutor's prerogative to do so. However, I point it out as evidence of the emphasis the State placed on its date rape drug theory.

11

above, emphasis was placed on the Listerine container with a powdery substance inside--a detail that, under different circumstances, would likely have been considered innocuous. Also, the prosecutor elicited testimony from the forensic scientist that a certain date rape drug, GHB, may have a "salty or soapy" taste and some date rape drugs may leave a residue when dissolved within a beverage--testimony reminiscent of K.G.'s statements regarding the taste and appearance of a shot Marsalis purchased for her. The prosecutor also guided the forensic scientist to testify that a victim may experience loss of consciousness with "flashes" of memory, as well as what a victim would feel like the next day--including nausea, vomiting, dizziness, lethargy, and like they have the "worst" hangover of their life--all symptoms K.G. testified she experienced the night of the incident and the next day. Furthermore, the forensic scientist testified GHB is detectable in urine for only approximately six to eight hours--allowing the State to explain why K.G.'s urinalysis did not detect any foreign substances. Finally, Christiansen elicited testimony specifically as to the likely effect in a person who drank alcohol and consumed date rape drugs--again referencing K.G.'s exact description of the incident.

As Marsalis points out on appeal, since there was no evidence of date rape drugs found in K.G.'s urine, Lt. Crawford's false testimony referenced the only remaining physical evidence to support the State's contention a date rape drug was used--and thus was responsible for leaving open the possibility of the jurors accepting the State's date rape drug theory. It is also clear from the transcript the date rape drug theory was the area of focus for the grand jury, as there were numerous questions asked by the jurors on the issue, especially to the state laboratory employee. Finally, contributing to the importance of the false evidence, there was the fact that, during the grand jury proceedings, the DNA test results indicating the presence of Marsalis's semen--from which the grand jury could find sexual intercourse even occurred--were not yet available.

In addition, the context of the prosecutor's behavior in this instance makes it especially troubling. It is well settled that prosecutors have "the responsibility of a *minister of justice* and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." *State v. Tupis*, 112 Idaho 767, 772, 735 P.2d 1078, 1083 (Ct. App. 1987) (citing Idaho Rules of Professional Conduct Rule 3.8 comment (1986)) (emphasis added). This role is especially magnified in the context of a grand jury proceeding, the very nature of which

12

completely excludes a defendant and an impartial judge and thus bestows the prosecutor with significant power. As the Third Circuit Court of Appeals has noted:

> [T]he prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. *Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.*

*United States v. Serubo*, 604 F.2d 807, 817 (1979) (emphasis added). *Accord United States v. Williams*, 504 U.S. 36, 62 (1992) (Stevens, J., dissenting); *State v. Jones*, 125 Idaho 477, 491-92, 873 P.2d 122, 136-37 (1994) (Bistline, J., dissenting).

In light of this imbalance and the resulting burden on the prosecution, and for the reasons above, I conclude that the indictment should have been dismissed and would reverse the district court's order denying the motion to dismiss the indictment.